## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **GOODRICH PETROLEUM** | § | **CASE NO. 16-31975** |
| **CORPORATION,** | § | |
| *et al.* | § | **(Chapter 11)** |
| | § | **(Joint Administration Requested)** |
| **DEBTORS.** | § | **(Emergency Hearing Requested)** |

**EMERGENCY MOTION TO (I) APPROVE MAINTENANCE OF CERTAIN
PRE-PETITION BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM
AND (II) CONTINUE USE OF EXISTING CHECKS AND BUSINESS FORMS**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY
CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF
YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE
A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU
MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE
DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE
WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT
FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED
WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE
MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST
ATTEND THE HEARING. UNLESS THE PARTIES AGREE
OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE
HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT
CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU
WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO
THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU
SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR
ATTORNEY.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above captioned debtors and debtors in possession (collectively, the "Debtors"),[1] file this *Emergency Motion to (i) Approve Maintenance of Certain Pre-Petition Bank Accounts and Cash Management System and (ii) Continue Use of Existing Checks and Business Forms* (the "Motion") and respectfully submit the following:

## JURISDICTION AND PROCEDURAL BACKGROUND

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      On April 15, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases").

4.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

5.      As of the date hereof, an official committee of unsecured creditors has not been appointed in the Cases.

## EMERGENCY CONSIDERATION

6.      The Debtors request emergency consideration of this Motion.  The Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations.  Any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  As such, the Debtors believe that emergency consideration is necessary and request that this Motion be heard at the Debtors' First Day Hearings.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Goodrich Petroleum Corporation (6193) and Goodrich Petroleum Company, L.L.C. (7273).

## STATEMENT OF FACTS

**A.    Business Overview**

7.      Goodrich Petroleum Corporation, a Delaware corporation ("Goodrich") is an independent oil and natural gas company engaged in the exploration, development, and production of oil and natural gas properties.  Goodrich Petroleum Company, L.L.C. ("Goodrich Subsidiary") is Goodrich's direct wholly owned subsidiary.

8.      The Debtors' producing properties are located primarily in (i) Northwest Louisiana and East Texas, which includes the Haynesville Shale Trend, (ii) Southwest Mississippi and Southeast Louisiana, which includes the Tuscaloosa Marine Shale Trend, and (iii) South Texas, which includes the Eagle Ford Shale Trend.  The Debtors maintain an administrative office in Houston, Texas.  As of December 31, 2015, the Debtors owned interests in 193 producing oil and natural gas wells located in 43 fields in eight states and the Debtors had estimated proved reserves of approximately 9.1 MMBoe, comprised of 31.9 Bcf of natural gas and 3.8 MMBbls of oil and condensate.

9.      Nearly all of the Debtors' proved oil and natural gas reserves are located in Louisiana, Texas, and Mississippi.  The Debtors presently have an ongoing development portfolio of prospects that it desires to drill.  Future capital spending will be initially directed toward long lateral wells in the Haynesville Shale Trend.  The Debtors also plan to devote a portion of future capital expenditures on drilling and completion activity in the Tuscaloosa Marine Shale Trend.

10.     Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in Goodrich's annual, quarterly, and

current reports filed with the Securities and Exchange Commission ("SEC"), which can be accessed at www.sec.gov and at Goodrich's website, http://www.goodrichpetroleum.com.

**B.      Secured Debt**

11.      Goodrich Subsidiary is the borrower under the Second Amended and Restated Credit Agreement between the Goodrich Subsidiary, Wells Fargo, National Association, as Administrative Agent (in its capacity as Administrative Agent, the "Senior Credit Facility Agent"), and certain lenders party thereto from time to time, dated May 5, 2009 (as heretofore amended, restated, supplemented or otherwise modified, the "Credit Agreement"), which governs the Debtors' senior secured revolving credit facility (the "Senior Credit Facility"). Goodrich Subsidiary's obligations under the Credit Agreement were guaranteed by Goodrich, and the obligations of the Debtors were secured by liens on substantially all of the assets owned by the Debtors, including, but not limited to, all of the real and personal property of the Debtors, including, without limitation, all equipment, all inventory, all oil, gas, and other hydrocarbons, all as-extracted collateral and all products and substances derived therefrom (including all raw materials and work in process, finished goods, and materials used or consumed in the manufacture or production thereof), all goods, all accounts, cash, payment intangibles, deposit accounts, accounts receivable, and other rights to payment.  As of March 29, 2016, the Debtors had $40.25 million of borrowings outstanding under the Senior Credit Facility.

12.      On March 12, 2015, the Debtors sold 100,000 units (the "Units"), each consisting of a $1,000 aggregate principal amount at maturity of the 8.00% Second Lien Senior Secured Notes due 2018 (the "8.00% Second Lien Notes") and one warrant to purchase 48.84 shares of the Common Stock (defined below).  The 8.00% Second Lien Notes are guaranteed by the Goodrich Subsidiary.  The Debtors received proceeds, before offering expenses payable by the

Debtors, of $100 million from the sale of the Units. The proceeds from the issuance of the 8.00% Second Lien Notes were used to repay borrowings under the Senior Credit Facility and for general corporate purposes. The 8.00% Second Lien Notes are secured on a senior second-priority basis by liens on assets of the Debtors that secure the Senior Credit Facility, which liens are subject to an inter-creditor agreement in favor of the lenders under the Senior Credit Facility. The 8.00% Second Lien Notes mature on March 15, 2018. If the aggregate principal amount outstanding on the 2032 Notes (defined below) on August 1, 2017 is more than $25.0 million then the outstanding amount of the 8.00% Second Lien Notes shall be due on September 1, 2017. Interest on the 8.00% Second Lien Notes is payable semi-annually in arrears on March 15 and September 15 of each year, beginning on September 15, 2015. As of March 29, 2016, $100 million in aggregate principal amount of the 8.00% Second Lien Notes remains outstanding plus accrued and unpaid interest.

13.     On October 1, 2015, the Debtors issued 38,250 units, each consisting of a $1,000 aggregate principal amount at maturity of the 8.875% Second Lien Senior Secured Notes due 2018 (the "8.875% Second Lien Notes" and, together with the 8.00% Second Lien Notes, the "Second Lien Notes") and one warrant to purchase approximately 156.9 shares of the Common Stock, in exchange for $76.5 million aggregate principal amount of the 2019 Notes (defined below). In addition, the Debtors issued approximately $36.8 million aggregate principal amount of the 8.875% Second Lien Notes in exchange for approximately $81.7 million aggregate principal amount of the 2019 Notes. The 8.875% Second Lien Notes are guaranteed by the Goodrich Subsidiary. The 8.875% Second Lien Notes are secured on a senior second-priority basis by liens on certain assets of the Debtors that secure the Senior Credit Facility, which liens are subject to an inter-creditor agreement in favor of the lenders under the Senior Credit Facility.

The 8.875% Second Lien Notes mature on March 15, 2018.  If the aggregate principal amount outstanding on the 2032 Notes (defined below) on August 1, 2017 is more than $25.0 million then the outstanding amount of the 8.875% Second Lien Notes shall be due on September 1, 2017.  Interest on the 8.875% Second Lien Notes is payable semi-annually in arrears on March 15 and September 15 of each year, beginning on March 15, 2016.  As of March 29, 2016, the $75 million in aggregate principal amount of the 8.875% Second Lien Notes remains outstanding plus accrued and unpaid interest.

## C.       Unsecured Debt

14.       On March 2, 2011, Goodrich sold $275 million of their 8.875% Senior Notes due 2019 (the "2019 Notes").  The 2019 Notes are senior unsecured obligations and rank equally in right of payment to all of Goodrich's other existing and future unsecured indebtedness.  The 2019 Notes accrue interest at a rate of 8.875% annually, and interest is paid semi-annually in arrears on March 15 and September 15.  The 2019 Notes are guaranteed by Goodrich Subsidiary. As of March 29, 2016, approximately $116.8 million aggregate principal amount of the 2019 Notes remains outstanding plus accrued and unpaid interest.

15.       In September 2009, the Debtors sold $218.5 million of the 5.00% Convertible Senior Notes due 2029 (the "2029 Notes").  The 2029 Notes are senior unsecured obligations, and as of March 29, 2016, approximately $6.7 million in aggregate principal amount of the 2029 Notes remains outstanding plus accrued and unpaid interest.

16.       The Debtors entered into separate, privately negotiated exchange agreements in August 2013 under which the Debtors retired $166.7 million in aggregate principal amount of the outstanding 2029 Notes in exchange for the issuance of 5.00% Convertible Senior Notes due 2032 (the "2032 Notes") in an aggregate principal amount of $166.3 million.  The 2032 Notes

are unsecured obligations of the Debtors that will mature on October 1, 2032.  As of March 29, 2016, $94.2 million in aggregate principal amount of the 2032 Notes remains outstanding plus accrued and unpaid interest.

17.    On September 8, 2015, the Debtors closed a privately-negotiated exchange under which the Debtors retired $55.0 million in principal amount of outstanding 2032 Notes in exchange for the issuance of approximately $27.5 million in aggregate original principal amount of 5.00% Convertible Exchange Senior Notes due 2032  (the "2032 Exchange Notes").  In addition, on October 14, 2015, the Debtors closed a privately-negotiated exchange under which the Debtors retired approximately $17 million in principal amount of outstanding 2032 Notes in exchange for the issuance of approximately $8.5 million in aggregate original principal amount of 2032 Exchange Notes.  The 2032 Exchange Notes are unsecured obligations of the Debtors. As of March 29, 2016, $6.1 million in aggregate principal amount of the 2032 Exchange Notes remains outstanding plus accrued and unpaid interest.

18.    As of March 29, 2016, approximately $0.4 million in aggregate principal amount of Goodrich's 3.25% Convertible Senior Notes due 2026 (the "2026 Notes" and, together with the 2019 Notes, the 2029 Notes, the 2032 Notes, and the 2032 Exchange Notes, the "Unsecured Notes") remains outstanding plus accrued and unpaid interest.  The 2026 Notes are unsecured obligations of the Debtors.

**D.    Preferred and Common Stock**

19.    As of March 31, 2016, the Debtors have 1,483,441 shares issued and outstanding of their 5.375% Series B Cumulative Convertible Preferred Stock (the "Series B Preferred Stock"), for a total liquidation value of $74,172,050.

20.     As of March 31, 2016, the Debtors have 3,060,412 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 10.00% Series C Cumulative Preferred Stock (the "<u>Series C Preferred Stock</u>"), for a total liquidation value of $76,510,300.

21.     As of March 31, 2016, the Debtors have 3,621,070 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 9.75% Series D Cumulative Preferred Stock (the "<u>Series D Preferred Stock</u>"), for a total liquidation value of $90,526,750.

22.     As of March 31, 2016, the Debtors have 2,902,539 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 10.00% Series E Cumulative Convertible Preferred Stock (the "<u>Series E Preferred Stock</u>" and, together with the Series B Preferred Stock, the Series C Preferred Stock, and the Series D Preferred Stock, the "<u>Preferred Stock</u>"), for a total liquidation value of $29,025,390.  The Preferred Stock ranks senior to the Common Stock and all Preferred Stock has parity with respect to the payment of dividends and distribution of assets upon liquidation, dissolution, or winding up.

23.     Goodrich is a publicly traded company, and as of March 31, 2016, Goodrich has 78,067,160 shares of Common Stock issued and outstanding.[2]

**E.     Other Significant Obligations**

---

[2] On January 13, 2016, the Debtors announced that they had received notification from the New York Stock Exchange ("<u>NYSE</u>") that the NYSE had commenced proceedings to delist the Common Stock as a result of the NYSE's determination that the Common Stock was no longer suitable for listing on the NYSE based on "abnormally low" price levels, and the NYSE suspended trading in the Common Stock.  The Series C Preferred Stock and Series D Preferred Stock were also suspended in connection with the suspension of the Common Stock. The Debtors began trading the Common Stock under the symbol "GDPM" on the OTC Markets marketplace (the "<u>OTC</u>") on January 14, 2016.  Both the Series C and Series D Preferred Stock will begin trading on the OTC under the symbols "GDPAL" and "GDUEL," respectively, upon receipt of clearance from the Financial Industry Regulatory Authority ("<u>FINRA</u>").  The Series E Preferred Stock was approved by FINRA on March 7, 2016 and began trading under the stock symbol "GDRRP."

24.     The Debtors are party to several significant pre-petition contracts.  In one of the largest of such contracts, Chesapeake Louisiana, L.P. ("Chesapeake LP") and Goodrich Subsidiary are parties to a long-term Gas Marketing Agreement (the "GMA") whereby Chesapeake Operating, LP ("Chesapeake Operating") charges Goodrich Subsidiary fees for its marketing services.  The GMA further allows Chesapeake Operating to deduct from the sale proceeds a proportionate share of any post-production expenses charged or deducted by gas purchasers, including marketing fees.  The GMA has a 20 year primary term starting December 1, 2008.

25.     Additionally, Goodrich Subsidiary and Frio LaSalle Pipeline, LP ("Frio La Salle") entered into a Gas Gathering and Processing Agreement (the "Frio La Salle Agreement"), that was amended and restated on October 1, 2012, where Frio La Salle agreed to construct certain processing facilities in order to connect wells being drilled by Goodrich Subsidiary to Frio La Salle's pipeline system in Frio and LaSalle Counties, Texas.  The Frio La Salle Agreement provides terms where Frio La Salle will gather, treat, compress, dehydrate, stabilize, condition, and process the gas produced by the Goodrich Subsidiary.

26.     Other agreements continue to burden the Debtors, including (i) a sales agreement with Champions Pipe and Supply, Inc., which began June 1, 2015 and ends November 10, 2016, and provides for casing supplies pertaining to the Tuscaloosa Marine Shale formation (the "Champions Agreement"), and (ii) a promissory note under which Goodrich Subsidiary promised to pay Fallon Family, L.P. the principal sum of one million ($1,000,000) in ten (10) equal semi-annual installment payments, with the first payment made on October 15, 2015 (the "Fallon Note").  The Champions Agreement and the Fallon Note are significant pre-petition obligations.

27.    In the ordinary course of business, the Debtors utilize an assortment of vendors, including drilling contractors, labor and repair contractors, parts and equipment suppliers, pipeline companies, heavy machinery and equipment lessors, hydrocarbon transporters, laborers, professionals, and employee benefits providers.

**F.    Events Leading to Chapter 11**

28.    A confluence of factors in 2015 and 2016 led to the Debtors' need to pursue a financial restructuring.

29.    The Debtors are an exploration and production company with interests in non-conventional oil and natural gas shale properties that require large investments of capital to develop.  The current significant decline in crude oil prices and the continued depressed natural gas prices has negatively impacted the Debtors' cash flows that enable them to invest in and maintain their properties and service their long term obligations.

30.    Beginning in the second half of 2014, commodity prices, particularly crude oil, began to decline sharply.  The decline became precipitous late in the fourth quarter of 2014 through 2015 and into 2016.  The significant magnitude of this price decline has materially and adversely impacted the Debtors' results of operations and led to substantial changes in the Debtors' operating and drilling programs in 2015 and into 2016.  As a result, the Debtors have focused on managing their balance sheet to reduce leverage and preserve liquidity during the current low commodity price environment.

31.    The Debtors have taken numerous actions to mitigate the effects of lower crude oil prices to conserve capital and enhance liquidity, including but not limited to: (i) dramatically reducing their capital expenditures in 2015 and 2016; (ii) generating savings by negotiating cost reductions from service providers; (iii) freezing salaries at 2014 levels, (iv) reducing the staff

headcount approximately 60% from 2014 levels; (v) reducing discretionary expenditures; (vi) extending the maturity of the Senior Credit Facility to February 24, 2017; (vii) receiving proceeds from the issuance of $100 million in 8.00% Second Lien Notes in March 2015; (viii) receiving net proceeds of $47.5 million from the sale of 12,000,000 shares of Common Stock to the public on March 10, 2015; (ix) closing the sale of proved reserves and a portion of the associated leasehold in the Eagle Ford Shale Trend in September 2015 for proceeds of approximately $110 million; (x) in September and October 2015, exchanging an aggregate of $72.1 million of the 2032 Notes for $36.0 million of new 2032 Exchange Notes, thereby reducing future annual cash interest by $1.8 million; (xi) in October 2015, exchanging $158.2 million of the 2019 Notes for $75.0 million of the 8.875% Second Lien Notes, thereby reducing their future annual cash interest by $7.4 million; (xii) suspending all preferred stock dividend payments beginning in the third quarter of 2015 to conserve capital.

32.     In addition, the Debtors attempted to restructure their liabilities under a comprehensive recapitalization plan to reduce their cost structure and improve their operating results, cash flow from operations, liquidity, and financial condition (the "Recapitalization Plan").  On January 26, 2016, the Debtors launched the Recapitalization Plan consisting of, among other transactions: (i) offers to exchange (the "Preferred Stock Exchange Offers") any and all shares of Goodrich's outstanding Series B Preferred Stock, any and all depositary shares, of Goodrich's outstanding Series C Preferred Stock, any and all of the depositary shares of Goodrich's outstanding Series D Preferred Stock, and any and all of the depositary shares of Goodrich's outstanding Series E Preferred Stock for newly issued shares of Common Stock, (ii) offers to exchange (the "Unsecured Notes Exchange Offers" and, together with the Preferred Stock Exchange Offers, the "Exchange Offers") any and all of the Debtors' outstanding

Unsecured Notes for newly issued shares of Common Stock; and (iii) private negotiations with holders of the Second Lien Notes (the "Second Lien Noteholders") to offer to exchange (the "Second Lien Exchange Offers") outstanding Second Lien Notes for new notes with materially identical terms except that interest thereon may be either (a) paid at the Debtors' option, in cash or in-kind or (b) deferred for some period of time (up to maturity).   Concurrently with the Exchange Offers, the Debtors called a special meeting of its stockholders to approve (i) an amendment to the Debtors' Restated Certificate of Incorporation increasing the number of authorized shares of the Debtors' Common Stock to 400 million (the "Authorized Share Amendment Proposal") to allow for the issuance of Common Stock in the various exchanges and (ii) amendments to the Certificate of Designation of each series of Preferred Stock that would, if approved, allow the Debtors to mandatorily concert such series of Preferred Stock into Common Stock at the rate offered in the applicable Exchange Offer.

33.    The closing of the Unsecured Notes Exchange Offers was conditioned on, among other things, holders of at least 95% of the aggregate principal amount of outstanding Unsecured Notes properly tendering and not validly withdrawing their Unsecured Notes in the Unsecured Notes Exchange Offers, or voluntarily converting their Unsecured Notes into Common Stock in accordance with the terms of such Unsecured Notes (the "Minimum Unsecured Tender Condition").  The closing of the Preferred Stock Exchange Offers was conditioned on, among other things, holders of at least a majority of the shares of Preferred Stock either properly tendering and not validly withdrawing their shares of Preferred Stock in the Preferred Stock Exchange Offers, or voluntarily converting their Preferred Stock into Common Stock in accordance with the terms of such Preferred Stock (the "Minimum Preferred Tender Condition" and, together with the Minimum Unsecured Tender Condition, the "Minimum Tender

Conditions"). Also, both Exchange Offers were conditioned on the Debtors' common shareholders approving the Authorized Share Amendment Proposal.

34.     The Exchange Offers expired on April 8, 2016. Holders of approximately 62% of the principal amount of outstanding Unsecured Notes tendered their notes to be exchanged and holders of approximately 43% of shares of outstanding Preferred Stock tendered their shares to be exchanged. Because the Minimum Tender Conditions were not met, the Company did not accept for exchange any of the Unsecured Notes or shares of Preferred Stock validly tendered and not withdrawn prior to the Expiration Date. In addition, a quorum was not reached at Goodrich's special meeting of stockholders on April 8, 2016 and the Authorized Share Amendment Proposal was not approved by a majority of the Debtors' outstanding common stockholders.

35.     The combination of the factors noted above and the failure of a sufficient number of holders of Unsecured Notes and Preferred Stock to tender their notes or shares in the Exchange Offers to meet the Minimum Tender Conditions compelled the Debtors to negotiate with their creditors regarding Chapter 11 proceedings in order to address liquidity concerns and maximize the value of their assets for the benefit of their creditors and other constituencies.

36.     The Debtors opted to conserve cash as they negotiated towards a restructuring by electing to exercise their right to a 30-day grace period with respect to certain interest payments due (i) March 15, 2016 on its $5.2 million interest payment due on its 2019 Notes, $4.0 million interest payment due on its 8.00% Second Lien Notes and $3.0 million interest payment due on its 8.875% Second Lien Notes and (ii) April 1, 2016 on its $0.2 million interest payment due on its 2029 Notes, $2.4 million interest payment due on its 2032 Notes and a $0.2 million interest

payment due on its 2032 Exchange Note.  The grace period with respect to the interest payments due on March 15, 2016 expired on April 14, 2016.

37.   On March 28, 2016, the Debtors and each of the Second Lien Noteholders' party thereto (the "Consenting Noteholders") executed a restructuring support agreement (as may be amended, supplemented, or otherwise modified from time to time, both as to substance and parties thereto) (the "Restructuring Support Agreement").  The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, each of the Consenting Noteholders, in connection with a restructuring of the Debtors pursuant to the restructuring term sheet attached thereto.

38.   On April 11, 2016, the Debtors launched a solicitation of votes by eligible voters to accept or reject a joint prepackaged chapter 11 plan of reorganization (the "Prepackaged Plan").[3]  By its terms, the Prepackaged Plan provided, *inter alia*, for: (i) payment in full, in cash, of all allowed administrative claims, professional fee claims, priority tax claims, statutory fees, other priority claims, and other secured claims; (ii) Senior Credit Facility claims are unimpaired and will receive such treatment as is mutually agreed to by the Debtors, the holders of Senior Credit Facility claims, and the Majority Second Lien Noteholders, which is still being negotiated and will be set forth in the plan supplement; (iii) Second Lien Notes will be converted for 100% of the new Goodrich equity interests, subject to dilution from shares issued in connection with a management incentive plan; (iv) unsecured notes claims will be canceled and extinguished; (v) holders of general unsecured claims will not receive a distribution under the Prepackaged Plan; (vi) equity interests in Goodrich Subsidiary will be reinstated and will vest in the company as a reorganized company; and (vii) equity interests in Goodrich will be canceled and discharged.

---

[3] The Second Lien Noteholders are the only voters eligible to vote on the Prepackaged Plan.

The deadline to accept or reject the Prepackaged Plan is 5:00 p.m. (Central Standard Time) on May 6, 2016, unless extended.

39.     The Prepackaged Plan will substantially reduce the Debtors' debt burden and solidify the Debtors' long-term growth and operating performance.  As such, the Debtors seek to proceed as expeditiously as possible through their chapter 11 cases to effectuate the restructuring under the Prepackaged Plan.

## THE DEBTORS' CASH MANAGEMENT SYSTEM

40.     Prior to commencing the Cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "Cash Management System").  The Cash Management System is designed to efficiently collect, transfer, and disburse funds for each of the Debtors.  Deposit account control agreements have been entered into with respect to certain of the Debtors' bank accounts, and certain of the Debtors' bank accounts are pledged to the lenders under the Senior Credit Facility and Second Lien Notes Indentures.

41.     The Debtors maintain accounting controls with respect to each of their bank accounts and are able to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Therefore, all transfers and transactions will be properly documented, and accurate records of all transfers and account balances will be maintained.  As a result, the Debtors will be able to accurately document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

42.     A list of the Debtors' bank accounts is attached hereto as **Exhibit A**.[4]   The principal components of the Cash Management System are described below.

## A.      The Debtors Bank Accounts

43.     The Debtors maintain four bank accounts with BBVA Compass ("Compass"): (i) Account No. XXXX-X44-406 (the "Goodrich Checking Account"), (ii) Account No. XXXX-X44-430 (the "Goodrich Payroll Account"), (iii) Account No. XXXXX-XXX4-3873 (the "Goodrich Royalty Account"), and (iv) Account No. XXXXXX-5368 (the "Segregated Royalty Account").[5]

44.     The funds received by the Debtors are transferred or deposited into the Goodrich Checking Account on a daily basis.  The Goodrich Checking Account holds funds from all cash receipts, including revenues, reimbursements, refunds, and joint interest billing, and disburses all payments, except royalties and payroll related disbursements.   The Debtors maintain spreadsheets with daily cash activity and review and provide instructions for cash management in the Goodrich Checking Account.  As of April 11, 2016, the Goodrich Checking Account maintained a balance of $9,694,457.81.

45.     The Goodrich Payroll Account is a zero balance account that holds no funds.  The Goodrich Payroll Account disburses all salary related disbursements, payroll taxes, and employee benefit disbursements that are transferred automatically from the Goodrich Checking Account each night, as necessary.

---

[4] As of the date of this Motion, the Debtors maintain four bank accounts.  Each of the Debtors' bank accounts is located within the United States.

[5] The Debtors have an interest in an escrow account with Wells Fargo Bank, National Association, that is jointly held with Samson Lone Star, LLC ("Samson") based on an escrow agreement dated November 3, 2014 (the "Escrow Account").  The Debtors are allowed, with approval from Samson via a joint written instruction, to request that funds from the Escrow Account be released for certain title defects or other issues that have been resolved. As of April 1, 2016, the Escrow Account had a balance of approximately $2,525,317.84.  The Debtors believe they will receive some of the funds in the Escrow Account, but do not know when at this time.

46.     The Goodrich Royalty Account is a zero balance account that holds no funds. The Goodrich Royalty Account disburses payments to royalty owners based on the prior month's revenue receipts for oil and gas sales that are transferred from the Goodrich Checking Account each night, as necessary.

47.     The Segregated Royalty Account will hold all funds of third parties necessary to be segregated under Rule 7(B) of the Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Southern District of Texas, available at http://www.txs.uscourts.gov/sites/txs/files/complex_rules.pdf    (the    "Complex Chapter 11 Guidelines"), that become due post-petition, along with royalty funds received pre-petition that have yet to be paid out.  This is a segregated account that keeps such funds separated from the Debtors' other accounts.  As of April 14, 2016, the Segregated Royalty Account maintained a balance of $1,069,831.10.

**B.     Bank Fees**

48.     In the ordinary course of business, the Debtors' banks debit the Debtors' bank accounts for a number of fees and expenses related to the cost of administering such bank accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "Bank Fees").  The Bank Fees are either debited directly from the Debtors' bank accounts or are paid in connection with wire transfers.

**RELIEF REQUESTED**

49.     The nature of the Debtors' business and the complex structure of the Debtors' Cash Management System make it critical that the Debtors' bank accounts be maintained and the Cash Management System be continued for the duration of the Cases.  Accordingly, the Debtors seek entry of an interim order (the "Interim Order"), and subsequently entry of a final order (the

"<u>Final Order</u>"), subject to any order authorizing the use of the Debtors' cash collateral: (a) authorizing the Debtors to maintain their existing bank accounts and Cash Management System; (b) authorizing the Debtors to continue their use of the current business forms and checks; (c) authorizing the Debtors to pay any undisputed pre-petition Bank Fees and continue to pay the Bank Fees in the ordinary course of business; and (d) waiving the requirement to comply with Bankruptcy Code § 345, to the extent, if any, the Debtors' bank accounts do not strictly comply therewith.

50.      The Debtors also respectfully request that the Court authorize and direct their banks to maintain, service, and administer the Debtors' bank accounts without interruption and in the ordinary course of business.  In this regard, the Debtors request the banks be authorized and directed to receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on such bank accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.  Notwithstanding the foregoing, any check, advise, draft, or other notification that the Debtors inform the banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the banks only to the extent authorized by order of the Court.

**A.      Continued Use of Pre-Existing Bank Accounts and Cash Management System**

51.      In order to supervise the administration of chapter 11 cases, the Office of the United States Trustee ("<u>UST</u>") has established certain operating guidelines (the "<u>UST Guidelines</u>") for debtors in possession.  *See Guidelines for Debtors-in-Possession*, U.S. Department of Justice, United States Trustee Program, Region 7, available at http://www.justice.gov/sites/default/files/ust-regions/legacy/2011/07/13/DIP_Guidelines.pdf.

52.     The UST Guidelines generally require chapter 11 debtors to, *inter alia*:

(a)     close all existing bank accounts;

(b)     open new bank accounts in a depository approved by the UST that are designated as debtor in possession accounts, with separate debtor in possession accounts established for an operating account, a tax account (to the extent that payroll or other taxes are an issue for the debtor), and a payroll account (to the extent that the debtor had a separate payroll account pre-petition);

(c)     obtain and utilize new checks for all debtor in possession accounts that bear the designation "Debtor in Possession" and contain other information about the chapter 11 case and ensure that the signature cards for all debtor in possession accounts clearly indicate that the debtor is a debtor in possession;

(d)     deposit all receipts and make all disbursements only though the approved debtor in possession accounts, with any funds in excess of those required for current operations being maintained in an interest-bearing account;

(e)     deposit to the tax debtor in possession account sufficient funds to pay any tax liability (when incurred) associated with the debtor's payroll; and

(f)     deposit all estate funds into an account with a financial institution that agrees to comply with the requirements of the UST and is an authorized depository approved by the UST.

*Id*. at §§ A-F.

53.     Requiring the Debtors to adopt new cash management systems and open new bank accounts at the same or different depositary institutions at this early and critical stage of the Cases would be expensive, impose needless administrative burdens on the Debtors, and would cause undue disruption to the Debtors' operations.   Any such disruption would affect the Debtors' ability to maximize estate values for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the continued use of the Debtors' bank accounts and Cash Management System provides a safe, efficient, and established means for the Debtors to maintain and manage their cash.

54.      The Debtors submit that a waiver of certain of the requirements of the UST Guidelines is appropriate in the Cases because maintenance of the Debtors' existing bank accounts and Cash Management System will minimize the disruption to the Debtors' operations and promote an orderly and efficient transition into chapter 11 and is entirely consistent with the goals underlying the UST Guidelines.  The Cash Management System constitutes an ordinary course and essential business practice and provides significant benefits to the Debtors and their estates including, *inter alia*, the ability to: (a) control corporate funds, (b) ensure the maximum availability of funds when necessary, and (c) reduce costs and administrative expenses by facilitating the movement of funds and by providing more timely and accurate account balance information.

55.      Accordingly, the Debtors request authority to: (a) maintain and continue to use any or all of their existing bank accounts (listed above) in the names and with the account numbers existing immediately prior to the commencement of the Cases, provided that the Debtors reserve the right to close some or all of their existing accounts and open new debtor in possession accounts; (b) deposit funds in and withdraw funds from any such accounts by all usual means, including checks, wire transfers, automatic clearinghouse transfers, electronic funds transfers, or other debits; and (c) treat their existing accounts (and any accounts opened post-petition) for all purposes as debtor in possession accounts.

56.      As set forth above, to ensure that all transfers and transactions will be documented in their books and records, the Debtors will continue to maintain records of all transfers within the Cash Management System.  To guard against improper transfers resulting from the post-petition honoring of pre-petition checks, the Debtors request that their banks be directed not to honor, subject to certain exceptions approved by this Court, any checks drawn on the Debtors'

**EMERGENCY MOTION TO (I) APPROVE MAINTENANCE OF CERTAIN PRE-PETITION BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM AND (II) CONTINUE USE OF EXISTING CHECKS AND BUSINESS FORMS**

bank accounts prior to the Petition Date.  To assist in this process, the Debtors will notify each bank with a disbursement account of the commencement of the Cases and will instruct each bank, subject to certain exceptions approved by this Court, not to honor any checks dated prior to the Petition Date and below an identified check number.  A form of the proposed notice to each of the Debtors' banks is attached hereto as **Exhibit B.**

57.     Bankruptcy courts in the Fifth Circuit have routinely granted authority for a debtor's continued use of its existing cash management procedures and policies, particularly where the entities involved form a large and complex organization.  *See e.g., In re ASARCO LLC,* No. 05-21207, Docket No. 52 (Bankr. S.D. Tex. Aug. 12, 2005); *In re ATP Oil & Gas Corp.*, No. 12-36187, Docket No. 135 (Bankr. S.D. Tex. Aug. 22, 2012); *In re Autoseis, Inc., et al.*, No. 14-20130, Docket No. 247 (Bankr. S.D. Tex. Apr. 25, 2014); *In re Buccaneer Res. LLC, et al.*, No. 14-60041, Docket No. 118 (Bankr. S.D. Tex. June 4, 2014); *In re Univ. Gen. Health Sys., Inc., et al.*, No. 15-31086, Docket No. 146 (Bankr. S.D. Tex. Mar. 23, 2015).

58.     The maintenance of the Cash Management System (together with the reporting discussed above) will accomplish the dual goals of minimizing the disruption to the Debtors' operations and satisfying the UST Guidelines.  The recording of transactions within the Cash Management System would afford a complete accounting of the Debtors' funds and would provide the UST comfort that the spirit of the UST Guidelines would be observed.

**B.     Waiver of Requirement Regarding Checks, Business Forms, and Signature Cards**

59.     The Debtors seek a waiver of the requirement to immediately purchase new checks and business forms that include the term "debtor in possession" and the case number assigned to the Cases.  With respect to the Debtors' bank accounts, the Debtors issue computer-

generated checks that can be modified electronically, at no additional cost to the Debtors' estates, to include the "debtor in possession" language and the case number assigned to the Cases.

60.     The Debtors further seek a waiver of the requirement to modify the signature cards for all bank accounts to indicate the Debtors are debtors in possession.  Requiring the Debtors to modify the signature cards for each of their bank accounts would be time consuming and burdensome.  Accordingly, the Debtors seek authority to maintain their existing signature cards for their debtor in possession bank accounts.

## C.     Waiver of Compliance with 11 U.S.C. § 345

61.     The Debtors further seek a waiver of the requirement to comply with Bankruptcy Code § 345, to the extent, if any, the Debtors' bank accounts do not strictly comply therewith.

62.     Bankruptcy Code § 345(a) provides that "[a] trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable return on such money, taking into account the safety of such deposit."  11 U.S.C. § 345(a).  Bankruptcy Code § 345(b) further provides that unless the Court orders otherwise, for deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require the institution with which the money is deposited or invested to either post a surety bond or deposit "securities of the kind specified in section 9303 of title 31."  11 U.S.C. § 345(b).

63.     Bankruptcy courts in the Fifth Circuit have authorized debtors to continue their pre-petition investment policies without requiring strict compliance with Bankruptcy Code § 345(b).  *See, e.g., In re ASARCO LLC,* No. 05-21207, Docket No. 52 (Bankr. S.D. Tex. Aug. 12, 2005); *In re ATP Oil & Gas Corp.*, No. 12-36187, Docket No. 135 (Bankr. S.D. Tex. Aug. 22,

2012);  *In re Univ. Gen. Health Sys., Inc., et al.*, No. 15-31086, Docket No. 146 (Bankr. S.D. Tex. Mar. 23, 2015).

64.     The Debtors' deposit accounts do not currently have any investments and the Debtors have no reason to believe at this time that any of their deposit accounts do not comply with Bankruptcy Code § 345.  Nevertheless, to the extent that any of the Debtors' deposit accounts do not comply strictly with Bankruptcy Code §  345, the Debtors submit that cause exists to waive any such noncompliance because all funds are deposited safely and prudently at financially stable banking institutions in a manner specifically designed to preserve capital, provide liquidity, and generate return.

## NOTICE

65.     Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to certain holders of the Second Lien Notes; (c) counsel to the administrative agent under the Senior Credit Facility; (d) counsel to the indenture trustee and collateral agent under the Second Lien Notes; (e) the Debtors' 20 largest unsecured creditors (on a consolidated basis); (f) those persons who have formally appeared in the Cases and requested service pursuant to Bankruptcy Rule 2002; (g) BBVA Compass Bank; (j) the Securities and Exchange Commission; (h) the Internal Revenue Service; and (i) all other applicable government agencies to the extent required by the Bankruptcy Rules and the Bankruptcy Local Rules.

## PRAYER

The Debtors respectfully request that the Court enter an Interim Order, and subsequently a Final Order: (a) authorizing the Debtors, subject to any order governing the use of the Debtors' cash collateral, to maintain their Cash Management System and the bank accounts associated therewith, including authorizing the Debtors to continue paying the Bank Fees associated with the banks' maintenance of the Cash Management System, in the ordinary course of business; (b) authorizing the Debtors to (i) utilize their existing checks and business forms and (ii) maintain their existing signature cards for all bank accounts; (c) waiving the requirement to comply with Bankruptcy Code § 345, to the extent, if any, the Debtors' bank accounts do not strictly comply therewith; (d) authorizing and directing the Debtors' banks to (i) maintain, service, and administer the Debtors' bank accounts without interruption and in the ordinary course of business, and (ii) receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on such bank accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; and (e) granting such other and further relief, both at law and in equity, as this Court deems just and proper.

Dated: April 15, 2016

Respectfully submitted,

**VINSON & ELKINS LLP**


By:   */s/ Bradley R. Foxman*

Harry A. Perrin, SBT # 1579800
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Ph. (713) 758-2222
Fax  (713) 758-2346
hperrin@velaw.com

and

Bradley R. Foxman, SBT # 24065243
Garrick C. Smith, SBT # 24088435
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975
Ph.  (214) 220-7700
Fax  (214) 220-7716
bfoxman@velaw.com
gsmith@velaw.com

and

David S. Meyer, NY # 4576344
Lauren R. Kanzer, NY # 5216635
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Ph.  (212) 237-0000
Fax (212) 237-0100
dmeyer@velaw.com
lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR THE
DEBTORS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 15, 2016, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

<u>   /s/ Bradley R. Foxman      </u>
One of Counsel

**<u>EXHIBIT A</u>**

**EXHIBIT A**

**LIST OF BANK ACCOUNTS[1]**

| No. | Account Holder | Bank Name | Account Name | Account Description | Account No. |
|-----|----------------|-----------|--------------|---------------------|-------------|
| 1 | Goodrich | BBVA Compass | Goodrich Checking Account | Any funds received by the Debtors are transferred or deposited in the Goodrich Checking Account. All payments are made from the Goodrich Checking Account besides royalty and payroll related disbursements. As of April 11, 2016, the Goodrich Checking Account maintained a balance of $9,694,457.81. | XXXX-X44-406 |
| 2 | Goodrich | BBVA Compass | Goodrich Payroll Account | The Goodrich Payroll Account is a zero balance account that holds no funds.  The Goodrich Payroll Account disburses all salary related disbursements, payroll taxes, and employee benefit disbursements that are transferred automatically from the Goodrich Checking Account. | XXX-X44-430 |
| 3 | Goodrich | BBVA Compass | Goodrich Royalty Account | The Goodrich Royalty Account is a zero balance account that holds no funds. The Goodrich Royalty Account disburses payments to royalty owners based on the prior month's revenue receipts for oil and gas sales that are transferred from the Goodrich Checking Account each night, as necessary. | XXXXX-XXX4-3873 |
| 4 | Goodrich | BBVA Compass | Segregated Royalty Account | The Segregated Royalty Account will hold all funds of third parties necessary to be segregated under Rule 7(B) of the Complex Chapter 11 Guidelines, that become due post-petition, along with royalty funds received pre-petition that have yet to be paid out.  This is a segregated account that keeps such funds separated from the Debtors' other accounts.  As of April 14, 2016, the Segregated Royalty Account maintained a balance of $1,069,831.10. | XXXXXX-5368 |

---

[1] Capitalized terms not defined herein have the meaning set forth in the Motion.

**<u>EXHIBIT B</u>**

# Vinson&Elkins

Bradley Foxman  bfoxman@velaw.com
**Tel** 214.220.7784  **Fax** 214.999.7784

_____, 2016

[Recipient's Contact and Address]

Re:   *In re Goodrich Petroleum Corporation, et al.*, Case No. 16-XXXXX

Dear _____:

Vinson & Elkins LLP represents Goodrich Petroleum Corporation and Goodrich Petroleum Company, LLC (collectively, the "Debtors") in the above-captioned cases (the "Cases"). The Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on April 15, 2016 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The Debtors maintain ____ accounts with _____: _____ (collectively, the "Accounts"). Under the Bankruptcy Code, you are prohibited from processing, honoring and/or paying all checks and fund transfer requests made prior to the Petition Date unless otherwise authorized by the Bankruptcy Court.

Beginning on the Petition Date, the Debtors will be issuing checks and requesting fund transfers from the Accounts in the ordinary course of business (collectively, the "Post-Petition Checks and Transfers"). To the extent of funds on deposit, the Post-Petition Checks and Transfers must be processed, honored, and paid. To assist you, the Debtors will write checks beginning with the following check numbers:

| Account No. | Check Number |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

**Vinson & Elkins LLP  Attorneys at Law**

Abu Dhabi  Austin  Beijing  Dallas  Dubai  Hong Kong  Houston
London  Moscow  New York  Palo Alto  Shanghai  Tokyo  Washington

Trammell Crow Center, 2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
**Tel** +1.214.220.7700  **Fax** +1.214.220.7716  **www.velaw.com**

US 4161756v.2



_____, 2016   Page 2

Unless otherwise authorized by the Bankruptcy Court, any checks less than the above-referenced check numbers should not be processed, honored or paid and any fund transfer requests made prior to the Petition Date should not be honored.

Should you have any questions, I can be reached by telephone at 214-220-7784 or by email at bfoxman@velaw.com.

Sincerely,

Bradley Foxman

**<u>Proposed Order</u>**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-31975 |
| GOODRICH PETROLEUM | § | |
| CORPORATION, | § | (Chapter 11) |
| *et al.* | § | |
| | § | JOINTLY ADMINISTERED |
| DEBTORS. | § | |

### INTERIM ORDER GRANTING EMERGENCY MOTION TO (I) APPROVE MAINTENANCE OF CERTAIN PRE-PETITION BANK ACCOUNTS AND CASH MANAGEMENT SYSTEM AND (II) CONTINUE USE OF EXISTING CHECKS AND BUSINESS FORMS

On April ___, 2016, the Court considered on an interim basis the *Emergency Motion to (i) Approve Maintenance of Certain Pre-Petition Bank Accounts and Cash Management System and (ii) Continue Use of Existing Checks and Business Forms* [Docket No. ___] (the "Motion")[1] filed by the above-referenced debtors and debtors in possession (collectively, the "Debtors").[2] The Court finds that (a) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334(b), (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and equity security holders, (d) proper and adequate notice of the Motion and hearing thereon has been given and that, except as set forth herein, no other or further notice is necessary, and (e) good and sufficient cause exists for the granting of the relief requested in the Motion

---

[1] Capitalized terms not defined herein shall have the meaning given to them in the Motion.

[2] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Goodrich Petroleum Corporation (6193) and Goodrich Petroleum Company, L.L.C. (7273).

after having given due deliberation upon the Motion and all of the proceedings had before the Court in connection with the Motion.  Therefore, it is

      **ORDERED** that the Motion is **GRANTED** to the extent provided herein.  It is further

      **ORDERED** that any objections to the Motion are **OVERRULED**.  It is further

      **ORDERED** that in the period between the Petition Date and the Final Hearing, except to the extent provided otherwise in this Interim Order, the Debtors are authorized to (a) maintain and continue to use any or all of their existing bank accounts identified in **<u>Exhibit A</u>** attached to the Motion (the "<u>Pre-Petition Bank Accounts</u>") in the names and with the account numbers existing immediately prior to the commencement of the Cases; provided, however, that the Debtors are authorized, but not directed, in coordination with the Office of the United States Trustee for the Southern District of Texas (the "<u>UST</u>"), to close any or all of the Pre-Petition Bank Accounts and open and maintain new debtor in possession accounts (the "<u>Post-Petition Bank Accounts</u>" and, together with the Pre-Petition Bank Accounts, the "<u>Bank Accounts</u>") in the ordinary course of business in their business judgment to enable the Debtors to comply with the UST Guidelines that the UST does not agree may be waived, modified, or altered by a final order on the Motion; (b) deposit funds in and withdraw funds from any of the Bank Accounts by all usual means, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits; and (c) treat their Pre-Petition Bank Accounts (and any Post-Petition Bank Accounts) for all purposes as debtor in possession accounts.  It is further

      **ORDERED** that in the event the Debtors open or close any Bank Accounts as authorized herein, the Debtors shall provide at least three (3) days' notice to the UST and the administrative agent under the Senior Credit Facility.  It is further

**ORDERED** that the Debtors are authorized to continue to maintain and utilize the Cash Management System as described in the Motion during the Interim Period.  It is further

**ORDERED** that the Debtors shall continue to maintain records of all transfers within the Cash Management System.  It is further

**ORDERED** that, as long as funds on deposit in the Bank Accounts are fully insured by the FDIC, the UST shall not require the Cash Management Banks (defined below) to post a bond or pledge securities during the Interim Period.  It is further

**ORDERED** that all of the banks at which the Bank Accounts are maintained (each, a "Cash Management Bank" and collectively, the "Cash Management Banks"), are authorized and directed to maintain, service, and administer such accounts, except that (a) the Cash Management Banks shall not be authorized to honor any check issued or dated prior to the Petition Date absent a separate order of this Court, (b) the Cash Management Banks shall not comply with any instructions by any secured creditor of the Debtors absent any order lifting the automatic stay of Bankruptcy Code § 362 (which order shall include any order by this Court in these cases authorizing the use of cash collateral), and (c) except to the extent provided otherwise herein, nothing in this Order shall in any way alter or impair the Cash Management Banks' respective rights pursuant to the account agreements in effect with respect to the Bank Accounts, including, without limitation, the Cash Management Banks' ability to close any of the Bank Accounts pursuant to the terms of such account agreements, but subject (to the extent applicable) to the provisions of the automatic stay of Bankruptcy Code § 362.  It is further

**ORDERED** that, absent a separate order of this Court, the Debtors shall identify for each of the Cash Management Banks all checks drawn on any of the Pre-Petition Bank Accounts outstanding on the Petition Date and instruct the respective Cash Management Bank to dishonor

same.  Any Cash Management Bank that honors a pre-petition check or other item drawn on the Pre-Petition Bank Account (a) at the direction of the Debtors, (b) in good-faith belief that the Court has authorized such pre-petition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, shall not be deemed to be liable to the Debtors or their estates or otherwise in violation of this Order.  It is further

**ORDERED** that the Debtors are authorized, subject to any order authorizing the use of the Debtors' cash collateral, to pay any undisputed, outstanding Bank Fees owed to any Cash Management Banks as of the Petition Date and to continue to pay the Bank Fees on a post-petition basis in the ordinary course of business.  It is further

**ORDERED** that the Debtors are authorized to use their existing check stock and business forms.  It is further

**ORDERED** that the Debtors are authorized to maintain their existing signature cards for all Bank Accounts; It is further

**ORDERED** to the extent, if any, the Debtors' bank accounts do not strictly comply with Bankruptcy Code § 345, the requirement to comply is hereby waived with respect to such accounts.  It is further

**ORDERED** that, notwithstanding anything to the contrary contained in this Order, (a) the authority granted herein is subject to all requirements and limitations imposed upon the Debtors under any order regarding the use of cash collateral, including with respect to any budgets governing or relating to such use, approved by the Court in these chapter 11 cases, (b) nothing contained herein shall modify, amend or alter such order or approved budget; and (c) to the extent there is any inconsistency between the terms of such cash collateral orders and any

action taken or proposed to be taken hereunder, the terms of such cash collateral orders shall control.  It is further

ORDERED that a final hearing on the Motion shall be held on _____ ___, 2016 at ___:___ __.m., Central Time, and objections to the Motion, if any, must be filed by _____ ___, 2016 and served upon counsel for the Debtors and the master service list in the Cases.  It is further

ORDERED that this Court shall retain jurisdiction to hear and consider all disputes arising from the interpretation or implementation of this Order.

Dated: April ___, 2016

_____
**UNITED STATES BANKRUPTCY JUDGE**