**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **GOODRICH PETROLEUM** | § | **CASE NO. 16-31975** |
| **CORPORATION,** | § | |
| *et al.* | § | **(Chapter 11)** |
| | § | **(Joint Administration Requested)** |
| **DEBTORS.** | § | **(Emergency Hearing Requested)** |

**DECLARATION OF ROBERT C. TURNHAM, JR.**
**IN SUPPORT OF FIRST DAY PLEADINGS**

I, **ROBERT C. TURNHAM, JR.**, declare the following to be true and accurate under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am over the age of 18 and am otherwise fully competent to make this declaration ("Declaration"). I am the President and Chief Operating Officer of Goodrich Petroleum Corporation ("Goodrich"), the parent company of Goodrich Petroleum Company, L.L.C. ("Goodrich Subsidiary," and collectively with Goodrich, as debtors and debtors in possession, the "Debtors"). In such capacity, I am generally familiar with the Debtors' businesses, day-to-day operations, and financial affairs.

2.      I submit this Declaration in support of the voluntary petitions for relief filed by the Debtors under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of April 15, 2016 (the "Petition Date") or concurrently herewith (collectively, the "First Day Pleadings").

3.      I have reviewed the First Day Pleadings and, to the best of my knowledge, formed after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maintain the value of the Debtors' estates. I also believe that,

absent immediate access to cash collateral and authority to make certain essential pre-plan payments and otherwise continue conducting ordinary course business operations as set forth herein, and described in greater detail in the First Day Pleadings, the Debtors would suffer immediate and irreparable harm to the detriment of their estates.

4.      All the facts and opinions set forth in this Declaration are based upon, my experience, knowledge, and information concerning the Debtors' operations, business financials, my review of relevant documents, information provided to me or verified by other executives or employees, conversations with other members of the Debtors' management, and my experience and knowledge in the oil and gas industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.  This financial information is presented on a consolidated basis for the Debtors, except where noted.  If called to testify, I would testify to the facts and opinions set forth herein based upon my personal knowledge, my review of relevant documents, and my investigation as President and Chief Operating Officer.  I am authorized to submit this declaration on behalf of the Debtors.

5.      Part I of this Declaration provides an overview of the Debtors' business operations, their capital structure and financial standing, and the circumstances surrounding the Debtors' commencement of the above-captioned cases (the "Cases").  Part II of this Declaration sets forth the facts relevant to the various First Day Pleadings in the Cases and the Debtors' business judgment in seeking such relief.  Part III of this Declaration sets forth my bases for concluding that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

## I.     Overview

### A.     Business Overview

6.     Goodrich Petroleum Corporation, a Delaware corporation ("Goodrich") is an independent oil and natural gas company engaged in the exploration, development, and production of oil and natural gas properties.  Goodrich Petroleum Company, L.L.C. ("Goodrich Subsidiary") is Goodrich's direct wholly owned subsidiary.

7.     The Debtors' producing properties are located primarily in (i) Northwest Louisiana and East Texas, which includes the Haynesville Shale Trend, (ii) Southwest Mississippi and Southeast Louisiana, which includes the Tuscaloosa Marine Shale Trend, and (iii) South Texas, which includes the Eagle Ford Shale Trend.  The Debtors maintain an administrative office in Houston, Texas.  As of December 31, 2015, the Debtors owned interests in 193 producing oil and natural gas wells located in 43 fields in eight states and the Debtors had estimated proved reserves of approximately 9.1 MMBoe, comprised of 31.9 Bcf of natural gas and 3.8 MMBbls of oil and condensate.

8.     Nearly all of the Debtors' proved oil and natural gas reserves are located in Louisiana, Texas, and Mississippi.  The Debtors presently have an ongoing development portfolio of prospects that it desires to drill.  Future capital spending will be initially directed toward long lateral wells in the Haynesville Shale Trend.  The Debtors also plan to devote a portion of future capital expenditures on drilling and completion activity in the Tuscaloosa Marine Shale Trend.

9.     Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in Goodrich's annual, quarterly, and

current reports filed with the Securities and Exchange Commission ("SEC"), which can be accessed at www.sec.gov and at Goodrich's website, http://www.goodrichpetroleum.com.

**B.      Secured Debt**

10.      Goodrich Subsidiary is the borrower under the Second Amended and Restated Credit Agreement between the Goodrich Subsidiary, Wells Fargo, National Association, as Administrative Agent (in its capacity as Administrative Agent, the "Senior Credit Facility Agent"), and certain lenders party thereto from time to time, dated May 5, 2009 (as heretofore amended, restated, supplemented or otherwise modified, the "Credit Agreement"), which governs the Debtors' senior secured revolving credit facility (the "Senior Credit Facility"). Goodrich Subsidiary's obligations under the Credit Agreement were guaranteed by Goodrich, and the obligations of the Debtors were secured by liens on substantially all of the assets owned by the Debtors, including, but not limited to, all of the real and personal property of the Debtors, including, without limitation, all equipment, all inventory, all oil, gas, and other hydrocarbons, all as-extracted collateral and all products and substances derived therefrom (including all raw materials and work in process, finished goods, and materials used or consumed in the manufacture or production thereof), all goods, all accounts, cash, payment intangibles, deposit accounts, accounts receivable, and other rights to payment.  As of March 29, 2016, the Debtors had $40.25 million of borrowings outstanding under the Senior Credit Facility.

11.      On March 12, 2015, the Debtors sold 100,000 units (the "Units"), each consisting of a $1,000 aggregate principal amount at maturity of the 8.00% Second Lien Senior Secured Notes due 2018 (the "8.00% Second Lien Notes") and one warrant to purchase 48.84 shares of the Common Stock (defined below).  The 8.00% Second Lien Notes are guaranteed by the Goodrich Subsidiary.  The Debtors received proceeds, before offering expenses payable by the

Debtors, of $100 million from the sale of the Units.  The proceeds from the issuance of the 8.00% Second Lien Notes were used to repay borrowings under the Senior Credit Facility and for general corporate purposes.  The 8.00% Second Lien Notes are secured on a senior second-priority basis by liens on assets of the Debtors that secure the Senior Credit Facility, which liens are subject to an inter-creditor agreement in favor of the lenders under the Senior Credit Facility.  The 8.00% Second Lien Notes mature on March 15, 2018.  If the aggregate principal amount outstanding on the 2032 Notes (defined below) on August 1, 2017 is more than $25.0 million then the outstanding amount of the 8.00% Second Lien Notes shall be due on September 1, 2017.  Interest on the 8.00% Second Lien Notes is payable semi-annually in arrears on March 15 and September 15 of each year, beginning on September 15, 2015.  As of March 29, 2016, $100 million in aggregate principal amount of the 8.00% Second Lien Notes remains outstanding plus accrued and unpaid interest.

12.     On October 1, 2015, the Debtors issued 38,250 units, each consisting of a $1,000 aggregate principal amount at maturity of the 8.875% Second Lien Senior Secured Notes due 2018 (the "8.875% Second Lien Notes" and, together with the 8.00% Second Lien Notes, the "Second Lien Notes") and one warrant to purchase approximately 156.9 shares of the Common Stock, in exchange for $76.5 million aggregate principal amount of the 2019 Notes (defined below).  In addition, the Debtors issued approximately $36.8 million aggregate principal amount of the 8.875% Second Lien Notes in exchange for approximately $81.7 million aggregate principal amount of the 2019 Notes.  The 8.875% Second Lien Notes are guaranteed by the Goodrich Subsidiary.  The 8.875% Second Lien Notes are secured on a senior second-priority basis by liens on certain assets of the Debtors that secure the Senior Credit Facility, which liens are subject to an inter-creditor agreement in favor of the lenders under the Senior Credit Facility.

The 8.875% Second Lien Notes mature on March 15, 2018.  If the aggregate principal amount outstanding on the 2032 Notes (defined below) on August 1, 2017 is more than $25.0 million then the outstanding amount of the 8.875% Second Lien Notes shall be due on September 1, 2017.  Interest on the 8.875% Second Lien Notes is payable semi-annually in arrears on March 15 and September 15 of each year, beginning on March 15, 2016.  As of March 29, 2016, the $75 million in aggregate principal amount of the 8.875% Second Lien Notes remains outstanding plus accrued and unpaid interest.

**C.      Unsecured Debt**

13.      On March 2, 2011, Goodrich sold $275 million of their 8.875% Senior Notes due 2019 (the "2019 Notes").  The 2019 Notes are senior unsecured obligations and rank equally in right of payment to all of Goodrich's other existing and future unsecured indebtedness.  The 2019 Notes accrue interest at a rate of 8.875% annually, and interest is paid semi-annually in arrears on March 15 and September 15.  The 2019 Notes are guaranteed by Goodrich Subsidiary.  As of March 29, 2016, approximately $116.8 million aggregate principal amount of the 2019 Notes remains outstanding plus accrued and unpaid interest.

14.      In September 2009, the Debtors sold $218.5 million of the 5.00% Convertible Senior Notes due 2029 (the "2029 Notes").  The 2029 Notes are senior unsecured obligations, and as of March 29, 2016, approximately $6.7 million in aggregate principal amount of the 2029 Notes remains outstanding plus accrued and unpaid interest.

15.      The Debtors entered into separate, privately negotiated exchange agreements in August 2013 under which the Debtors retired $166.7 million in aggregate principal amount of the outstanding 2029 Notes in exchange for the issuance of 5.00% Convertible Senior Notes due 2032 (the "2032 Notes") in an aggregate principal amount of $166.3 million.  The 2032 Notes

are unsecured obligations of the Debtors that will mature on October 1, 2032.  As of March 29, 2016, $94.2 million in aggregate principal amount of the 2032 Notes remains outstanding plus accrued and unpaid interest.

16.     On September 8, 2015, the Debtors closed a privately-negotiated exchange under which the Debtors retired $55.0 million in principal amount of outstanding 2032 Notes in exchange for the issuance of approximately $27.5 million in aggregate original principal amount of 5.00% Convertible Exchange Senior Notes due 2032  (the "2032 Exchange Notes").  In addition, on October 14, 2015, the Debtors closed a privately-negotiated exchange under which the Debtors retired approximately $17 million in principal amount of outstanding 2032 Notes in exchange for the issuance of approximately $8.5 million in aggregate original principal amount of 2032 Exchange Notes.  The 2032 Exchange Notes are unsecured obligations of the Debtors. As of March 29, 2016, $6.1 million in aggregate principal amount of the 2032 Exchange Notes remains outstanding plus accrued and unpaid interest.

17.     As of March 29, 2016, approximately $0.4 million in aggregate principal amount of Goodrich's 3.25% Convertible Senior Notes due 2026 (the "2026 Notes" and, together with the 2019 Notes, the 2029 Notes, the 2032 Notes, and the 2032 Exchange Notes, the "Unsecured Notes") remains outstanding plus accrued and unpaid interest.  The 2026 Notes are unsecured obligations of the Debtors.

**D.     Preferred and Common Stock**

18.     As of March 31, 2016, the Debtors have 1,483,441 shares issued and outstanding of their 5.375% Series B Cumulative Convertible Preferred Stock (the "Series B Preferred Stock"), for a total liquidation value of $74,172,050.

19.     As of March 31, 2016, the Debtors have 3,060,412 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 10.00% Series C Cumulative Preferred Stock (the "Series C Preferred Stock"), for a total liquidation value of $76,510,300.

20.     As of March 31, 2016, the Debtors have 3,621,070 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 9.75% Series D Cumulative Preferred Stock (the "Series D Preferred Stock"), for a total liquidation value of $90,526,750.

21.     As of March 31, 2016, the Debtors have 2,902,539 depositary shares issued and outstanding each representing a 1/1000th ownership interest in a share of the 10.00% Series E Cumulative Convertible Preferred Stock (the "Series E Preferred Stock" and, together with the Series B Preferred Stock, the Series C Preferred Stock, and the Series D Preferred Stock, the "Preferred Stock"), for a total liquidation value of $29,025,390.  The Preferred Stock ranks senior to the Common Stock and all Preferred Stock has parity with respect to the payment of dividends and distribution of assets upon liquidation, dissolution, or winding up.

22.     Goodrich is a publicly traded company, and as of March 31, 2016, Goodrich has 78,067,160 shares of Common Stock issued and outstanding.[1]

---

[1] On January 13, 2016, the Debtors announced that they had received notification from the New York Stock Exchange ("NYSE") that the NYSE had commenced proceedings to delist the Common Stock as a result of the NYSE's determination that the Common Stock was no longer suitable for listing on the NYSE based on "abnormally low" price levels, and the NYSE suspended trading in the Common Stock.  The Series C Preferred Stock and Series D Preferred Stock were also suspended in connection with the suspension of the Common Stock. The Debtors began trading the Common Stock under the symbol "GDPM" on the OTC Markets marketplace (the "OTC") on January 14, 2016.  Both the Series C and Series D Preferred Stock will begin trading on the OTC under the symbols "GDPAL" and "GDUEL," respectively, upon receipt of clearance from the Financial Industry Regulatory Authority ("FINRA").  The Series E Preferred Stock was approved by FINRA on March 7, 2016 and began trading under the stock symbol "GDRRP."

**E.     Other Significant Obligations**

23.     The Debtors are party to several significant pre-petition contracts.  In one of the largest of such contracts, Chesapeake Louisiana, L.P. ("Chesapeake LP") and Goodrich Subsidiary are parties to a long-term Gas Marketing Agreement (the "GMA") whereby Chesapeake Operating, LP ("Chesapeake Operating") charges Goodrich Subsidiary fees for its marketing services.  The GMA further allows Chesapeake Operating to deduct from the sale proceeds a proportionate share of any post-production expenses charged or deducted by gas purchasers, including marketing fees.  The GMA has a 20 year primary term starting December 1, 2008.

24.     Additionally, Goodrich Subsidiary and Frio LaSalle Pipeline, LP ("Frio La Salle") entered into a Gas Gathering and Processing Agreement (the "Frio La Salle Agreement"), that was amended and restated on October 1, 2012, where Frio La Salle agreed to construct certain processing facilities in order to connect wells being drilled by Goodrich Subsidiary to Frio La Salle's pipeline system in Frio and LaSalle Counties, Texas.  The Frio La Salle Agreement provides terms where Frio La Salle will gather, treat, compress, dehydrate, stabilize, condition, and process the gas produced by the Goodrich Subsidiary.

25.     Other agreements continue to burden the Debtors, including (i) a sales agreement with Champions Pipe and Supply, Inc., which began June 1, 2015 and ends November 10, 2016, and provides for casing supplies pertaining to the Tuscaloosa Marine Shale formation (the "Champions Agreement"), and (ii) a promissory note under which Goodrich Subsidiary promised to pay Fallon Family, L.P. the principal sum of one million ($1,000,000) in ten (10) equal semi-annual installment payments, with the first payment made on October 15, 2015 (the

"Fallon Note").  The Champions Agreement and the Fallon Note are significant pre-petition obligations.

26.      In the ordinary course of business, the Debtors utilize an assortment of vendors, including drilling contractors, labor and repair contractors, parts and equipment suppliers, pipeline companies, heavy machinery and equipment lessors, hydrocarbon transporters, laborers, professionals, and employee benefits providers.

## F.      Events Leading to Chapter 11

27.      A confluence of factors in 2015 and 2016 led to the Debtors' need to pursue a financial restructuring.

28.      The Debtors are an exploration and production company with interests in non-conventional oil and natural gas shale properties that require large investments of capital to develop.  The current significant decline in crude oil prices and the continued depressed natural gas prices has negatively impacted the Debtors' cash flows that enable them to invest in and maintain their properties and service their long term obligations.

29.      Beginning in the second half of 2014, commodity prices, particularly crude oil, began to decline sharply.  The decline became precipitous late in the fourth quarter of 2014 through 2015 and into 2016.  The significant magnitude of this price decline has materially and adversely impacted the Debtors' results of operations and led to substantial changes in the Debtors' operating and drilling programs in 2015 and into 2016.  As a result, the Debtors have focused on managing their balance sheet to reduce leverage and preserve liquidity during the current low commodity price environment.

30.      The Debtors have taken numerous actions to mitigate the effects of lower crude oil prices to conserve capital and enhance liquidity, including but not limited to: (i) dramatically

reducing their capital expenditures in 2015 and 2016; (ii) generating savings by negotiating cost reductions from service providers; (iii) freezing salaries at 2014 levels, (iv) reducing the staff headcount approximately 60% from 2014 levels; (v) reducing discretionary expenditures; (vi) extending the maturity of the Senior Credit Facility to February 24, 2017; (vii) receiving proceeds from the issuance of $100 million in 8.00% Second Lien Notes in March 2015; (viii) receiving net proceeds of $47.5 million from the sale of 12,000,000 shares of Common Stock to the public on March 10, 2015; (ix) closing the sale of proved reserves and a portion of the associated leasehold in the Eagle Ford Shale Trend in September 2015 for proceeds of approximately $110 million; (x) in September and October 2015, exchanging an aggregate of $72.1 million of the 2032 Notes for $36.0 million of new 2032 Exchange Notes, thereby reducing future annual cash interest by $1.8 million; (xi) in October 2015, exchanging $158.2 million of the 2019 Notes for $75.0 million of the 8.875% Second Lien Notes, thereby reducing their future annual cash interest by $7.4 million; (xii) suspending all preferred stock dividend payments beginning in the third quarter of 2015 to conserve capital.

31.      In addition, the Debtors attempted to restructure their liabilities under a comprehensive recapitalization plan to reduce their cost structure and improve their operating results, cash flow from operations, liquidity, and financial condition (the "Recapitalization Plan").  On January 26, 2016, the Debtors launched the Recapitalization Plan consisting of, among other transactions: (i) offers to exchange (the "Preferred Stock Exchange Offers") any and all shares of Goodrich's outstanding Series B Preferred Stock, any and all depositary shares, of Goodrich's outstanding Series C Preferred Stock, any and all of the depositary shares of Goodrich's outstanding Series D Preferred Stock, and any and all of the depositary shares of Goodrich's outstanding Series E Preferred Stock for newly issued shares of Common Stock, (ii)

offers to exchange (the "<u>Unsecured Notes Exchange Offers</u>" and, together with the Preferred Stock Exchange Offers, the "<u>Exchange Offers</u>") any and all of the Debtors' outstanding Unsecured Notes for newly issued shares of Common Stock; and (iii) private negotiations with holders of the Second Lien Notes (the "<u>Second Lien Noteholders</u>") to offer to exchange (the "<u>Second Lien Exchange Offers</u>") outstanding Second Lien Notes for new notes with materially identical terms except that interest thereon may be either (a) paid at the Debtors' option, in cash or in-kind or (b) deferred for some period of time (up to maturity).   Concurrently with the Exchange Offers, the Debtors called a special meeting of its stockholders to approve (i) an amendment to the Debtors' Restated Certificate of Incorporation increasing the number of authorized shares of the Debtors' Common Stock to 400 million (the "<u>Authorized Share Amendment Proposal</u>") to allow for the issuance of Common Stock in the various exchanges and (ii) amendments to the Certificate of Designation of each series of Preferred Stock that would, if approved, allow the Debtors to mandatorily concert such series of Preferred Stock into Common Stock at the rate offered in the applicable Exchange Offer.

32.    The closing of the Unsecured Notes Exchange Offers was conditioned on, among other things, holders of at least 95% of the aggregate principal amount of outstanding Unsecured Notes properly tendering and not validly withdrawing their Unsecured Notes in the Unsecured Notes Exchange Offers, or voluntarily converting their Unsecured Notes into Common Stock in accordance with the terms of such Unsecured Notes (the "<u>Minimum Unsecured Tender Condition</u>").   This Minimum Unsecured Tender Condition was a requirement from certain unsecured noteholders in order for them to participate in the Unsecured Notes Exchange Offers. The closing of the Preferred Stock Exchange Offers was conditioned on, among other things, holders of at least a majority of the shares of Preferred Stock either properly tendering and not

validly withdrawing their shares of Preferred Stock in the Preferred Stock Exchange Offers, or voluntarily converting their Preferred Stock into Common Stock in accordance with the terms of such Preferred Stock (the "Minimum Preferred Tender Condition" and, together with the Minimum Unsecured Tender Condition, the "Minimum Tender Conditions"). The Minimum Preferred Tender Condition was also a requirement from certain unsecured noteholders in order for them to participate in the Unsecured Notes Exchange Offers. Also, both Exchange Offers were conditioned on the Debtors' common shareholders approving the Authorized Share Amendment Proposal.

33.    The Exchange Offers expired on April 8, 2016. Holders of approximately 62% of the principal amount of outstanding Unsecured Notes tendered their notes to be exchanged and holders of approximately 43% of shares of outstanding Preferred Stock tendered their shares to be exchanged. Because the Minimum Tender Conditions were not met, the Company did not accept for exchange any of the Unsecured Notes or shares of Preferred Stock validly tendered and not withdrawn prior to the Expiration Date. In addition, a quorum was not reached at Goodrich's special meeting of stockholders on April 8, 2016 and the Authorized Share Amendment Proposal was not approved by a majority of the Debtors' outstanding common stockholders.

34.    The combination of the factors noted above and the failure of a sufficient number of holders of Unsecured Notes and Preferred Stock to tender their notes or shares in the Exchange Offers to meet the Minimum Tender Conditions compelled the Debtors to negotiate with their creditors regarding Chapter 11 proceedings in order to address liquidity concerns and maximize the value of their assets for the benefit of their creditors and other constituencies.

35.     The Debtors opted to conserve cash as they negotiated towards a restructuring by electing to exercise their right to a 30-day grace period with respect to certain interest payments due (i) March 15, 2016 on its $5.2 million interest payment due on its 2019 Notes, $4.0 million interest payment due on its 8.00% Second Lien Notes and $3.0 million interest payment due on its 8.875% Second Lien Notes and (ii) April 1, 2016 on its $0.2 million interest payment due on its 2029 Notes, $2.4 million interest payment due on its 2032 Notes and a $0.2 million interest payment due on its 2032 Exchange Note.  The grace period with respect to the interest payments due on March 15, 2016 expired on April 14, 2016.

36.     On March 28, 2016, the Debtors and each of the Second Lien Noteholders' party thereto (the "Consenting Noteholders") executed a restructuring support agreement (as may be amended, supplemented, or otherwise modified from time to time, both as to substance and parties thereto) (the "Restructuring Support Agreement").   The Consenting Noteholders comprise 56% of the holders and 92% of principal amount of the Second Lien Notes.   The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, each of the Consenting Noteholders, in connection with a restructuring of the Debtors pursuant to the restructuring term sheet attached thereto.

37.     On April 11, 2016, the Debtors launched a solicitation of votes by eligible voters to accept or reject a joint prepackaged chapter 11 plan of reorganization (the "Prepackaged Plan").[2]  By its terms, the Prepackaged Plan provided, *inter alia*, for: (i) payment in full, in cash, of all allowed administrative claims, professional fee claims, priority tax claims, statutory fees, other priority claims, and other secured claims; (ii) Senior Credit Facility claims are unimpaired

---

[2] The Second Lien Noteholders are the only voters eligible to vote on the Prepackaged Plan.

and will receive such treatment as is mutually agreed to by the Debtors, the holders of Senior Credit Facility claims, and the Majority Second Lien Noteholders, which is still being negotiated and will be set forth in the plan supplement; (iii) Second Lien Notes will be converted for 100% of the new Goodrich equity interests, subject to dilution from shares issued in connection with a management incentive plan; (iv) unsecured notes claims will be canceled and extinguished; (v) holders of general unsecured claims will not receive a distribution under the Prepackaged Plan; (vi) equity interests in Goodrich Subsidiary will be reinstated and will vest in the company as a reorganized company; and (vii) equity interests in Goodrich will be canceled and discharged. The deadline to accept or reject the Prepackaged Plan is 5:00 p.m. (Central Standard Time) on May 6, 2016, unless extended.

38.     The Prepackaged Plan will substantially reduce the Debtors' debt burden and solidify the Debtors' long-term growth and operating performance.  As such, the Debtors seek to proceed as expeditiously as possible through their chapter 11 cases to effectuate the restructuring under the Prepackaged Plan.

## II.     REQUEST FOR EMERGENCY HEARINGS ON FIRST DAY MOTIONS[3]

39.     As set forth above, the Debtors are operating in a cash-intensive industry and are struggling to meet their day-to-day liquidity needs in order to derive the maximum revenue from existing and future production.  The Debtors intend to seek entry of Court orders approving each of the First Day Pleadings as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules.  Absent the Court granting the relief requested by the Debtors in their First Day Pleadings on an emergency basis, the Debtors will suffer immediate and irreparable harm.

---

[3] Capitalized terms not defined herein have the meanings set forth in the respective First Day Pleadings.

40.     I have reviewed the First Day Pleadings listed below and the allegations contained in each are true and correct to the best of my knowledge.

A.     **Administrative and Procedural Matters**

i.     ***Debtors' Notice of Designation as Complex Chapter 11 Cases*** (**the "Notice of Complex Designation"**)

41.     Currently, the Debtors have total debt of approximately $440 million and there are more than 50 parties in interest in the Cases.  I believe that application of the Complex Chapter 11 Procedures to the Cases will ensure appropriate notice of the filings in the Cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders.  Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Designation.

ii.     ***Emergency Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases*** (**the "Joint Administration Motion"**)

42.     The Debtors are related.  Goodrich is the direct parent and sole equity interest owner of Goodrich Subsidiary.  I am aware that many, if not all, of the notices, applications, motions, other pleadings, hearings, and orders in the Cases will relate to relief sought jointly by both of the Debtors.  If each Case were administered independently, there would be a number of duplicative pleadings and overlapping service.  This unnecessary duplication of identical documents would be wasteful of the resources of the Debtors' estates, as well as the resources of this Court and of other parties in interest.

43.     Joint administration of the Cases for procedural purposes only, under a single docket entry, will permit the Clerk of the Court to use a single general docket for all of the Cases and to combine notices to creditors and other parties in interest by ensuring that all parties in

interest will be able to review one docket to stay apprised of the various matters before the Court regarding the Cases. Similarly, supervision of the administrative aspects of the Cases by the United States Trustee (the "UST") will be simplified. Accordingly, I believe joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the UST, and the Court.

44. Further, joint administration of the Cases will not give rise to any conflict of interest among the Debtors' estates, and the rights of the Debtors' respective creditors will not be adversely affected by joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records. I believe the recoveries of all creditors will be enhanced by the reduction in costs resulting from joint administration of the Cases, and the Court will also be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files.

45. For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

iii. ***Motion For Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline, (C) Approving the Solicitation Procedures, and (D) Approving the Confirmation Hearing Notice* (the "Disclosure Statement Scheduling Motion")**

46. The Debtors commenced solicitation of holders of claims regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures. On April 11, 2016, the Debtors caused their solicitation agent, BMC Group, Inc. (the "Solicitation Agent"),[4] to distribute packages containing the Disclosure Statement, the Plan, and ballots (the

---

[4] The Debtors have also applied for authority to retain BMC Group as their claims and noticing agent.

"Solicitation Packages") to holders of claims entitled to vote to accept or reject the Plan as of the Voting Record Date.  Holders of claims to whom the Solicitation Packages were transmitted were directed in the Disclosure Statement and ballots to follow the instructions contained in the ballots (and described in the Disclosure Statement) to complete and submit their respective ballots to cast a vote to accept or reject the Plan.  Each holder was explicitly informed in the Disclosure Statement and applicable ballot that such holder needed to submit its ballot such that it is actually received by the Solicitation Agent on or before the Voting Deadline to be counted.  Certain holders of claims and interests were not provided a Solicitation Package because such holders are: (a) unimpaired under, and conclusively presumed to accept, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired, entitled to receive no distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

47.    As clearly set forth in the Disclosure Statement and ballots, the Voting Deadline is set for May 6, 2016, or 25 days after the date of the start of solicitation and distribution of the Plan.  The Debtors expect to complete a final tabulation of the ballots on or about May 9, 2016.

48.    I submit that the Solicitation Procedures should be approved, and I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Disclosure Statement Scheduling Motion.

iv.    *Emergency Motion For (a) Authority to File a Consolidated List of Creditors; (b) Authority to File a Consolidated List of 50 Largest Unsecured Creditors; (c) Setting of Bar Dates; and (d) Approval of the Form and Manner of Notifying Creditors of the Commencement of the Cases and Other Information* (the "Notification Motion")

49.    There are hundreds of creditors and parties in interest in the Cases.  The Debtors maintain lists of the names and addresses of all such entities on various computer programs that

permit the Debtors or an outside firm to print mailing labels for each such entity.  I believe that the most effective and efficient manner by which to accomplish the process of photocopying and transmitting notices in the Cases is to authorize BMC Group, Inc., the Debtors' proposed noticing and claims agent (the "Noticing and Claims Agent"), to act as an authorized noticing agent of the Court.  The Debtors will separately file an application to employ the Noticing and Claims Agent to serve this purpose.

50.     Because the preparation of separate lists of creditors for each Debtor would be expensive and time consuming, and because a large number of creditors are shared amongst the Debtors, I believe the consolidated Creditors Matrix and the Top 20 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

51.     I believe that service of the single Notice of Commencement will not only avoid confusion among the Debtors' creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous master creditors matrix.  Accordingly, I believe that service of a single Notice of Commencement is warranted.

52.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notification Motion.

      **v.**     ***Emergency Motion Seeking Extension of Time to File Schedules of Assets and Liabilities, Current Income and Expenditures, Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* (the "<u>Schedules and Statements Motion</u>")**

53.     The Debtors' management and employees, together with the Debtors' outside legal and financial advisors, have begun compiling the information necessary to complete the Schedules and Statements; however, due to the size and complexity of the Debtors' businesses,

their limited staffing, and their pre-petition focus on restructuring their financial affairs, the Debtors have not yet had a sufficient opportunity to complete the preparation of the Schedules and Statements.  While the Debtors maintain extensive books and records, completing the Schedules and Statements will require the collection, analysis, and compilation of a significant amount of data.  Meanwhile, the Debtors are experiencing the considerable stresses of preparing for the filing of the Cases, transitioning into chapter 11, working with creditors to reorganize the Debtors' estates, and the preexisting, ongoing responsibilities of operating their business. Accordingly, I do not anticipate the Debtors will be capable of finalizing their Schedules and Statements within the 14-day period prescribed by the Bankruptcy Rules.

54.     Granting the Debtors additional time to collect the data needed to prepare and file the Schedules and Statements will greatly enhance their accuracy, while allowing the Debtors to simultaneously focus their attention on other high priority matters in the early stages of the Cases.  I anticipate that it will take the Debtors' management and employees, with the assistance of their legal and professional advisors, 30 days to complete, review, and file the Schedules and Statements with the Court.

55.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Schedules and Statements Motion.

**B.     Substantive Matters**

    i.     ***Emergency Motion to (i) Approve Maintenance of Certain Pre-Petition Bank Accounts and Cash Management System and (ii) Continue Use of Existing Checks and Business Forms*** (the "**Cash Management Motion**")

56.     Cash Management System.  Prior to commencing the Cases, the Debtors managed their cash, receivables, and payables through a cash management system (the "Cash Management

System").   The Cash Management System is designed to efficiently collect, transfer, and disburse funds for each of the Debtors.  Deposit account control agreements have been entered into with respect to certain of the Debtors' bank accounts, and certain of the Debtors' bank accounts are pledged to the lenders under the Senior Credit Facility and Second Lien Notes Indentures.

57.     I believe that the Cash Management System is essential to the day-to-day operation of the Debtors' businesses.  Changing their bank accounts and creating a new cash management system from scratch would force the Debtors to incur significant and unnecessary costs and expenses, completely impair their business operations, cause confusion, disrupt payments, and introduce inefficiency at a time when efficiency is most critical.  The Cash Management System is highly computerized and automated, and the Debtors maintain accounting controls with respect to each of their bank accounts to enable them to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Therefore, all transfers and transactions occurring within the Cash Management System will be properly documented, and accurate records of account balances will be maintained.  Accordingly, I believe the maintenance of the Cash Management System will benefit all parties in interest.

58.     Bank Accounts.  Historically, the Debtors have maintained four bank accounts at various banks and financial institutions.   A complete list of the Debtors' bank accounts may be found at **Exhibit A** to the Cash Management System.

59.     The Debtors maintain three bank accounts with BBVA Compass ("Compass"): (i) Account No. XXXX-X44-406 (the "Goodrich Checking Account"), (ii) Account No. XXXX-X44-430 (the "Goodrich Payroll Account"), (iii) Account No. XXXXX-XXX4-3873 (the "Goodrich Royalty Account"), and (iv) Account No. XXXXXX-5368 (the "Segregated Royalty Account").[5]

60.     The funds received by the Debtors are transferred or deposited into the Goodrich Checking Account on a daily basis.  The Goodrich Checking Account holds funds from all cash receipts, including revenues, reimbursements, refunds, and joint interest billing, and disburses all payments, except royalties and payroll related disbursements.   The Debtors maintain spreadsheets with daily cash activity and review and provide instructions for cash management in the Goodrich Checking Account.  As of April 14, 2016, the Goodrich Checking Account maintained a balance of $5,150,370.93.

61.     The Goodrich Payroll Account is a zero balance account that holds no funds.  The Goodrich Payroll Account disburses all salary related disbursements, payroll taxes, and employee benefit disbursements that are transferred automatically from the Goodrich Checking Account each night, as necessary.

62.     The Goodrich Royalty Account is a zero balance account that holds no funds. The Goodrich Royalty Account disburses payments to royalty owners based on the prior month's

---

[5] The Debtors have an interest in an escrow account with Wells Fargo Bank, National Association, that is jointly held with Samson Lone Star, LLC ("Samson") based on an escrow agreement dated November 3, 2014 (the "Escrow Account"). The Debtors are allowed, with approval from Samson via a joint written instruction, to request that funds from the Escrow Account be released for certain title defects or other issues that have been resolved. As of April 1, 2016, the Escrow Account had a balance of approximately $2,525,317.84.  The Debtors believe that some of the funds in the Escrow Account will be released and they should receive a portion of those funds, but do not know when at this time.

revenue receipts for oil and gas sales that are transferred from the Goodrich Checking Account each night, as necessary.

63.     The Segregated Royalty Account will hold all funds of third parties necessary to be segregated under Rule 7(B) of the Complex Chapter 11 Guidelines, that become due post-petition, along with royalty funds received pre-petition that have yet to be paid out.  This is a segregated account that keeps such funds separated from the Debtors' other accounts.  As of April 14, 2016, the Segregated Royalty Account maintained a balance of $1,069,831.10.

64.     I understand the United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.  I believe that, under the circumstances, a waiver of the United States Trustee's requirement that the Debtors' bank accounts be closed and that new post-petition bank accounts be opened is warranted.  If enforced in the Cases, I believe that such requirements would cause significant and unnecessary disruption in the Debtors' business, thereby impairing their efforts to operate efficiently and pursue opportunities to maximize the value of their estates.

65.     Requiring the Debtors to adopt new cash management systems and open new bank accounts at the same or different depositary institutions at this early and critical stage of the Cases would be expensive, impose needless administrative burdens on the Debtors, and would cause undue disruption to the Debtors' operations.   Any such disruption would affect the Debtors' ability to maximize estate values for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the continued use of the Debtors' bank accounts and Cash Management System provides a safe, efficient, and established means for the Debtors to maintain and manage their cash.

66.    <u>Business Forms</u>.    Prior to commencing the Cases, in the ordinary course of business, the Debtors used numerous business forms, including, but not limited to, letterhead, purchase orders, invoices, contracts, and checks.  The Debtors issue computer-generated checks from most of their bank accounts that can be modified electronically, at no additional cost to the Debtors' estates, to include the "debtor in possession" language and the case number assigned to the Cases.

67.    <u>Bank Fees</u>.    In the ordinary course of business, the Debtors' banks debit the Debtors' bank accounts for a number of fees and expenses related to the cost of administering such bank accounts, including, *inter alia*, wire transfers and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "<u>Bank Fees</u>").  The Bank Fees are either debited directly from the Debtors' bank accounts or are paid in connection with wire transfers.  The Bank Fees are a normal cost of doing business and, without authority to pay such Bank Fees, the Cash Management System would be significantly impaired.  Accordingly, I believe the Debtors should be authorized to continue paying the Bank Fees in the ordinary course of business.

68.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

ii.    ***Emergency Motion for Approval of Interim and Final Use of Cash Collateral and Granting Adequate Protection* (the "<u>Cash Collateral Motion</u>")**

69.    The Debtors have an immediate need for the use of Cash Collateral in order to, among other things, preserve and maintain the value of their assets and businesses and maximize the return to all creditors so that they may execute a sale process and receive the highest possible

value therein. Further, an immediate and critical need exists for the Debtors to use Cash Collateral, consistent with the Budget, for working capital purposes, general corporate purposes, and the satisfaction of costs and expenses of administering the Cases. The Debtors are without sufficient funds, other than Cash Collateral, to operate until the Final Hearing can be held. Further, the Debtors are unable to obtain adequate unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense.

70. Access to cash collateral is critical for the Debtors to proceed through chapter 11 and consummate the restructuring contemplated by the Prepackaged Plan. Absent the ability to use Cash Collateral, the Debtors will be forced to shut down their operations abruptly, which the Debtors believe will negatively impact the value of their assets and eliminate any prospect of confirming the Prepackaged Plan, destroying months of hard fought negotiations.

71. For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Collateral Motion.

> iii. *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs, and (II) Directing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related Thereto* (the "__Wages Motion__")

72. <u>Wages and Salaries</u>. The Debtors employ approximately 51 individuals on a full-time basis (the "Employees"). Fifty of the Employees receive a salary and one is paid on an hourly basis. None of the Employees are represented by a union or collective bargaining unit. In addition to the Employees, the Debtors also retain individuals as independent contractors (the "Independent Contractors") to perform specialized functions, as well as temporary workers (the "Temporary Staff") from a staffing agency (the "Staffing Agency") to fulfill certain duties on a

short-term basis.  The Debtors currently retain approximately eight Independent Contractors and Temporary Staff in the aggregate.  The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Debtors' Employees.

73.     The Debtors pay Employees' wages, salaries, and other compensation on a semi-monthly basis (collectively, the "Employee Compensation").  The Debtors' aggregate semi-monthly payroll is approximately $275,855.[6]  As of the Petition Date, the Debtors estimate that Employees are owed an aggregate of approximately $1,200 on account of accrued and unpaid wages earned prior to the Petition Date (the "Unpaid Wages"), all of which will become due in the first 21 days after the Petition Date.

74.     Independent Contractors and Temporary Staff Compensation. The Debtors rely on eight Independent Contractors and Temporary Staff in the ordinary course of business.  The Independent Contractors and Temporary Staff perform pumping services in the field as well as administrative functions.  The Debtors' Employees rely on the support of Independent Contractors and Temporary Staff to supplement their workforce, particularly for positions that are not economically feasible to fill on a full- or part-time basis.  The Debtors believe the authority to continue paying their Independent Contractors and the Staffing Agency is critical to minimizing disruption of the Debtors' continued business operations.  On average, the Debtors spend approximately $90,000 on Independent Contractors on a monthly basis and approximately $4,000 on Temporary Staff on a monthly basis.

75.     The Debtors estimate that, as of the Petition Date, the Independent Contractors are owed an aggregate of approximately $130,000 on account of accrued services rendered prior to the Petition Date (the "Unpaid Contractor Amounts"), all of which will become due in the first

---

[6]     The average annual salary for the Debtors' Employees is approximately $130,000.

21 days after the Petition Date.  The Debtors estimate that, as of the Petition Date, the prepetition obligations owed to Staffing Agencies are estimated at approximately $700 (the "Unpaid Temporary Staffing Obligations"), all of which will become due in the first 21 days after the Petition Date.

76.     Payroll Processing. To administer and process payroll and direct deposit transfers, the Debtors use the services of Automatic Data Processing, Inc. ("ADP"), a third party payroll service provider.  ADP makes payments to Employees, Temporary Staff, Taxing Authorities (as defined below), and certain Employee benefits providers on behalf of the Debtors.

77.     The Debtors pay approximately $1,700 per month to ADP for the payroll services it provides to the Debtors (the "Payroll Fees").  As of the Petition Date, the Debtors owe approximately $950 on account of Payroll Fees.  It is critically important that the Debtors be able to continue to compensate Employees on the historical payroll schedule, and to do so requires the services of ADP

78.     Incentive Compensation. Historically, the Debtors offered discretionary annual bonus payments to their Employees based on performance metrics.  In September 2015, the Debtors transitioned to a retention bonus program in the form of cash awards paid quarterly (the "Retention Bonuses").  All Employees are eligible for the Retention Bonuses, which are awarded based on an Employee remaining as a full-time Employee on the date on which such bonuses are paid.  Retention Bonuses for the second quarter of 2016 are scheduled to be paid in July 2016 and the maximum amount payable for all Employees on account of such bonuses is approximately $386,000.

79.     I understand the Debtors are not seeking authority to make any payments on account of Retention Bonuses pursuant to this Motion, but reserve the right to seek the Court's approval to continue the Retention Bonuses at a later date.

80.     The Debtors maintain a long-term incentive plan (the "LTIP"), approved by shareholders in 2006 and last amended in 2015, which provides for grants of restricted stock and stock option to officers, Employees, and non-employee directors.  The LTIP provides that the Debtors' compensation committee has authority to determine the participants to whom stock options and restricted stock are granted.

81.     The stock options issued under the LTIP vest ratably on the anniversary of the date of grant over a period of time, typically three years and expire seven to ten years after the granting date.[7]  No stock options were granted in 2013, 2014, or 2015, and as of December 31, 2015, 60,000 shares under stock option plans remained outstanding.[8]  Restricted stock issued under the LTIP typically has a three year vesting period, during which time ownership of the shares cannot be transferred and the shares are subject to forfeiture if employment ends before the end of the vesting period.  As of December 31, 2015, approximately 3.1 million shares of unvested restricted stock remained outstanding.

82.     Approximately 2,500 shares of restricted stock will vest post-petition.  The Debtors request authority to cash settle these shares for total payment of approximately $125 (the "LTIP Vesting Payments"), with approximately $21.70 of this amount coming due in the first 21 days following the Petition Date.[9]  The Debtors seek authority to make the LTIP Vesting

---

[7]     Stock options grant to non-employee directors, however, vest immediately.

[8]     These options expire on May 9, 2016; however, with a strike price of $27.81 the options are significantly out of the money.

[9]     The Debtors have elected to cash settle these shares given the approximately $0.04 trading price of the Debtors' Common Stock.

**DECLARATION OF ROBERT C. TURNHAM, JR.**
**IN SUPPORT OF FIRST DAY PLEADINGS**                                              **Page 28 of 49**

Payments on a post-petition basis and in the ordinary course of business.  The Debtors are not seeking authority to make any grants on account of the LTIP pursuant to this Motion, but reserve the right to seek the Court's approval to continue the LTIP at a later date.

83.     <u>Reimbursable Expenses</u>.    In the ordinary course of business, the Debtors reimburse Employees for certain expenses, including, airfare, car rental, lodging, cellular telephones, and meal expenses, incurred in performing their employment duties, and a monthly bus pass reimbursement benefit (the "<u>Reimbursable Expenses</u>").  The majority of Reimbursable Expenses are paid directly by the Employees.[10]  The Debtors pay approximately $20,000 per month on account of Reimbursable Expenses.  Because of the irregular nature of requests for expense reimbursements, it is difficult for the Debtors to precisely determine the amount of unpaid Reimbursable Expenses at any given time.  Based on historical practice, the Debtors estimate roughly that, as of the Petition Date, Employees are owed approximately $20,000, or roughly one month of unpaid Reimbursable Expenses (including Reimbursable Expenses for which Employees have not yet requested reimbursement).

84.     Employees have incurred Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse them.  Accordingly, to avoid harming Employees who incurred Reimbursable Expenses, and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to (a) honor any prepetition obligations related to Reimbursable Expenses, (b) pay Employees or applicable credit card companies on account of Reimbursable Expenses that have accrued prepetition or accrue postpetition but relate to the prepetition period,

---

[10]    The Debtors also use three corporate credit cards issued by Compass Bank and Wex Bank (the "<u>Corporate Cards</u>") to pay for certain expenses, including gas for field operations.  The Debtors pay the Corporate Card balances directly through their accounts payable system.

and (c) continue reimbursing Employees for Reimbursable Expenses in accordance with past practice and in the ordinary course of business.

85.     <u>Deductions and Withholding Obligations</u>.  The Debtors are required by law to withhold from Employees' paychecks certain amounts related to federal and state income taxes, social security taxes, and Medicare taxes (each, a "<u>Withholding Tax</u>") and to remit any such withheld amounts to the appropriate taxing authorities.  The Debtors are also required to make certain additional payments from their own funds in connection with the Withholding Taxes, including matching payments on account of social security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance (together with the Withholding Taxes, the "<u>Payroll Taxes</u>").

86.     On average, the Debtors withhold and contribute approximately $95,300 per payroll period for Payroll Taxes, including both Employee and Debtor-paid amounts.  As of the Petition Date, all prepetition Payroll Taxes have been paid in full.  Because the Debtors are statutorily obligated to remit Payroll Taxes, their inability to do so may result in adverse legal consequences that could disrupt the reorganization process.  Moreover, the Debtors believe that certain of the Payroll Taxes are generally held in trust by the Debtors and are not property of their estates.

87.     In addition to the Payroll Taxes, the Debtors routinely deduct certain amounts from Employees' paychecks during each applicable payroll period, including amounts on accounts of (a) garnishments including tax levies, child support, and court-ordered garnishments and (b) other pre- and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein, such as an Employee's share of health care benefits, insurance premiums,

contributions under flexible spending plans, and 401(k) contributions (collectively, the "Deductions").

88.     On average, the Debtors remit approximately $27,000 per payroll period on account of the Deductions.  The Debtors believe that the Deductions are generally held in trust by the Debtors and are not property of their estates.

89.     Employee Benefit Plans.  In the ordinary course of business, the Debtors make various benefit plans available to their Employees.  These benefit plans, described in detail herein, fall within the following categories: (a) paid time off, including sick days, vacation days, and jury duty leave (together, the "Employee Leave Benefits"); (b) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment ("AD&D") insurance, and long-term disability (together, the "Health and Welfare Benefits"); (c) 401(k) plan (the "Retirement Benefits"); (d) severance benefits; and (e) miscellaneous benefits (each of (a)– (e), an "Employee Benefit" and collectively, the "Employee Benefits").  Although the Debtors maintain certain Employee Benefit plans themselves, other Employee Benefit plans, such as the Retirement Benefits, are maintained by third parties

90.     Eligible Employees accrue paid time off and related benefits as generally described below.

91.     Vacation Days.  The Debtors provide vacation days ("Vacation Days") to their Employees as a paid time-off benefit.  Employees accrue Vacation Days throughout the year, with the number of Vacation Days based upon an Employee's years of industry experience. Employees may use vacation days at their discretion.  Employees may carry over 40 hours of vacation to the next year, and non-officer Employees may monetize their unused Vacation Days at the end of the year for 50 cents on the dollar (for up to 40 hours).  In the event an Employee is

terminated, that Employee is reimbursed for accrued but unused vacation days at the Employee's base compensation rate, or as required by law.

92.     Because Employees are only entitled to a cash payment for accrued, but unused Vacation Days if they terminate their employment or at the end of the year, the total amount of Vacations Days accrued is typically much larger than any cash payments made by the Debtors on account of Vacation Days.   The Debtors estimate that approximately $160,850 of unused Vacation Days has accrued as of the Petition Date.

93.     *Holidays.*  The Debtors recognize 9 holidays, as a paid time-off benefit for their Employees (each a "Holiday" and, collectively, the "Holidays").  Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at either their hourly or salaried rate.[11]  Employees are not entitled to cash payments for Holidays.  Thus, the Debtors do not believe there are any obligations owing as of the Petition Date on account of Holidays.

94.     *Leave Time.*  Employees are also entitled to take certain other paid leaves of absence (collectively, "Leave Time").  Leave Time includes sick leave, jury duty, short-term disability, military leave, bereavement, and family medical leave.  Employees are not entitled to cash payments for unused Leave Time; therefore, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leave time.

95.     The Debtors believe that the continuation of the Employee Leave Benefits, including Vacation Days, Holidays, and Leave Time, in accordance with prior practice, is important to maintaining Employee morale during these chapter 11 cases.

---

[11]     The Debtors' one hourly Employee may work on Holidays.  If this Employee does work on a Holiday, he is paid his hourly wage as well as payment for the Holiday.

96.    <u>Health and Welfare Plans</u>.   The Debtors sponsor several Health and Welfare Benefits programs to provide benefits to eligible Employees.   The Health and Welfare Benefits include medical, vision, dental, and prescription drug plans, flexible spending accounts, life and AD&D insurance, critical illness and cancer care insurance, workers' compensation benefits, and short-term and long-term disability benefits.

97.    *Medical, Vision, and Dental Benefits*.   The Debtors administer the following health benefits plans through various insurers to eligible Employees and their families, including, among other things, medical, prescription drug, vision, and dental benefits (collectively, the "<u>Health Benefit Plans</u>").

    a)  <u>Medical Plans</u>.  Approximately 49 Employees are covered under the Debtors' medical and prescription drug plans (the "<u>Medical Plans</u>").   The Medical Plans are administered by UMR and Script Care.   The Medical Plans are self-insured and require the Debtors to pay all costs arising under such plans, aside from Employee contribution deductions, including claims payments and associated administrative costs.

    b)  <u>Vision Plan</u>.  The Debtors offer Employees the option of participating in a vision plan (the "<u>Vision Plan</u>").  Approximately 50 Employees are enrolled in the Vision Plan.  The Vision Plan is provided through VSP.

    c)  <u>Dental Plan</u>.  Approximately 50 Employees are covered under the Debtors' dental plan (the "<u>Dental Plan</u>").   The Dental Plan is administered by The Guardian.  The Dental Plan is self-insured and requires the Debtors to pay all costs arising under such plan, including claims payments and associated administrative costs.

    d)  <u>Stop Loss Insurance</u>.   In conjunction with the Health Benefits Plans, the Debtors have purchased stop-loss insurance through Zurich American Insurance Company ("<u>Zurich</u>"), which provides additional protection against large claims made by Employees under the Medical Plans (the "<u>Stop Loss Insurance</u>").   The Stop Loss Insurance is an integral part of the Debtors' management of the risk of the self-insured Health Benefit Plans and loss of the coverage would subject the Debtors to undue risk.   The Debtors pay approximately $100,000 annually to Zurich in premiums for the Stop Loss Insurance.  As of the Petition Date, the Debtors do not owe any amounts on account of the Stop Loss Insurance.

98.     Because the majority of the Health Benefit Plans are self-insured, claims arising thereunder are funded on a "pay as you go" basis and average approximately $157,000 per month.  The Debtors estimate that, as of the Petition Date, they owe approximately $78,500 on account of the Health Benefit Plans (the "Unpaid Health Benefits"), all of which will become due and owing within the first 21 days following the Petition Date.  As such, the Debtors request authority to (a) remit the Unpaid Health Benefits, (b) continue the Health Benefit Plans for eligible Employees, and (c) pay any amounts related thereto, including claim amounts and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business and consistent with past practice.

99.     *Flexible Spending Accounts*.    The Debtors offer Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses (the "Flexible Spending Accounts").    Participating Employees contribute in equal amounts from each paycheck throughout the year up to the $2,550 limit on the health care Flexible Spending Account and the $5,000 limit on the dependent care Flexible Spending Account.  Currently, approximately 26 Employees maintain Flexible Spending Accounts, and the Debtors withhold approximately $56,500 annually on account of Employee contributions to the Flexible Spending Accounts.  The Debtors pay a *de minimis* fee to ADP to administer the Flexible Spending Accounts, which amount is included as part of the Payroll Fees.

100.    *COBRA*.    Under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), Employees who are terminated, and such Employees' families, have the right to continue their health benefits from their employer for a limited period of time and under certain circumstances.  COBRA benefits are provided to exiting Employees as required by law.  The

cost is generally borne by the exiting employee except for an administration charge of approximately $1.19 per month, per employee, which is paid by the Debtors.  Sixteen former Employees are currently receiving COBRA medical benefits.  The Debtors are paying the monthly premiums for thirteen of these former Employees through May 2016 at a cost of approximately $2,700 per month.

101.    *Life Insurance, AD&D Insurance, and Disability Benefits*.  The Debtors provide basic life and AD&D insurance (the "Life and AD&D Insurance") and long-term disability insurance (the "Long-Term Disability Insurance") to eligible full-time Employees through a policy with Unum Group ("Unum").  All of the Debtors' Employees currently participate in the Life and AD&D Insurance and Long-Term Disability Insurance.  The Life and AD&D Insurance provides a maximum benefit of $500,000 per Employee and the Long-Term Disability Insurance pays 60% of the Employee's base pay per month, up to $10,000 per month.  In each case, the Debtors fund 100% of the plan's basic coverage costs.

102.    The coverage provided by these policies costs the Debtors approximately $3,800 per month.  As of the Petition Date, the Debtors estimate they owe approximately $1,900 to Unum on account liabilities related to Life and AD&D Insurance and the Long-Term Disability Insurance.

103.    *Supplemental and Voluntary Insurance*.  In addition to the life insurance provided by the Debtors, Employees have the option to purchase supplemental term life insurance or whole life insurance (collectively, the "Supplemental Life Insurance") through Aflac Inc. ("Aflac").  Premiums for the Supplemental Life Insurance are paid entirely by the participating Employee.  Full-time Employees also have the option to purchase voluntary critical care, cancer care, and accident insurance through Aflac for themselves and their spouse and dependents

(collectively, the "Voluntary Insurance"). Premiums for the Voluntary Insurance are paid entirely by the participating Employee.

104.    Approximately 27 Employees have elected to purchase Supplemental Life Insurance and/or Voluntary Insurance. The Debtors remit approximately $2,000 per payroll period to Aflac on account of the Supplemental Life Insurance and Voluntary Insurance. As of the Petition Date, the Debtors do not believe there are any prepetition amounts owed to Aflac on account of the Supplemental Life Insurance or Voluntary Insurance.

105.    *Workers' Compensation*. The Debtors provide workers' compensation insurance for their Employees at the statutorily-mandated level for each state in the United States in which they operate (collectively, the "Workers' Compensation Program").[12] The Debtors do not believe they owe any prepetition amounts on account of the administration fees for the Workers' Compensation Program.

106.    The Debtors do not believe that they currently have any workers' compensation claims outstanding.

107.    Because the Debtors are statutorily obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process.

108.    Retirement Benefits. The Debtors maintain a 401(k) plan for the benefit of certain eligible Employees (the "401(k) Plan"). The 401(k) Plan is administered by Alliance Benefits Group and overseen by a third-party trustee. As of the Petition Date, the Debtors

---

[12]   The Debtors' workers' compensation insurance policies and the premiums associated therewith are addressed in the *Emergency Motion for Order Authorizing Debtors to Continue Insurance Policies*, filed contemporaneously herewith.

**DECLARATION OF ROBERT C. TURNHAM, JR.**
**IN SUPPORT OF FIRST DAY PLEADINGS**                                    **Page 36 of 49**

estimate that they approximately $100 to the trustee for services rendered prior to the Petition Date.

109.     Approximately 42 Employees currently participate in the 401(k) Plan.    The Debtors estimate that they withhold approximately $38,000 per month from Employees' paychecks on account of employee 401(k) contributions.

110.     Historically, the Debtors have matched employee contributions dollar for dollar, up to six percent (6%) (collectively, "Plan Matching Contributions").    Plan Matching Contributions have been suspended, however, as of March 31, 2016.    Accordingly, the Debtors do not owe any prepetition amounts on account of Plan Matching Contributions.

111.     Severance Plan.    The Debtors provide severance payments (the "Severance Payments") to certain Employees pursuant to employee-specific severance agreements or the Debtors' non-officer severance program.    The Debtors also have a non-officer change of control severance plan in place, which entitles certain covered Employees to a lump sum severance payment that ranges from 12 weeks' to 52 weeks' worth of the Employee's salary, as well as the continuation of certain Health and Welfare Benefits.    No Employees are currently receiving Severance Payments.    Accordingly, as of the Petition Date, the Debtors do not owe any amounts related to Severance Payments incurred prepetition.

112.     Miscellaneous Benefits.    The Debtors also provide eligible Employees with certain additional benefits, including employee parking, no cost tobacco cessation drugs, and an employee assistance program provided by Unum.    The Debtors estimate that these additional benefits cost approximately $9,800 per month.    The Debtors pay these expenses as they arise in the ordinary course of business and believe that no amounts are owed on account of prepetition miscellaneous benefits.

**DECLARATION OF ROBERT C. TURNHAM, JR.**
**IN SUPPORT OF FIRST DAY PLEADINGS**                                            **Page 37 of 49**

113.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Wages Motion.

           iv.    ***Emergency Motion for Interim and Final Orders Providing Adequate Assurance of Utility Payments* (the "<u>Utility Motion</u>")**

114.    <u>Utility Services</u>.  Numerous Utilities provide the Debtors with traditional utility services, such as telephone and communications, information technology, electricity, water, sewer, and other similar services that are necessary for the continued operation of the Debtors' day-to-day affairs.  Uninterrupted utility service is critical to the Debtors' business operations, and the loss of utility service would substantially disrupt the Debtors' operations and result in revenue loss, which could irreparably harm and jeopardize the Debtors' operations and strategic objectives of all parties of interest.

115.    I believe that the proposed Adequate Assurance Deposits listed on **<u>Exhibit A</u>** to the Utility Motion, which are calculated based on one-half of the approximation of one month's worth of utility service as calculated by the Debtors according to the last historical 12-month period, are sufficient adequate assurance of the Debtors' future payments to the Utility providers.[13]

116.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Utility Motion.

           v.    ***Emergency Motion for Order Authorizing Debtors to Continue Insurance Policies* (the "<u>Insurance Motion</u>")**

---

[13] As set forth on **<u>Exhibit A</u>** to the Utility Motion, the proposed Adequate Assurance Deposits total $21,595.50.

117.   <u>Insurance Broker and Agent</u>.  The Debtors employ Lockton and Wortham as their insurance broker and agent.  The Debtors pay Lockton and Wortham a fee to find and sell the Insurance Policies to the Debtors.[14]  Lockton and Wortham also advise the Debtors on the appropriate policies for the Debtors' businesses.  Additionally, the Debtors and Talbot are party to a Premium Financing Agreement dated June 8, 2015 ("<u>Premium Financing Agreement</u>") whereby the Debtors finance payments for certain insurance premiums that are assigned to and serviced by USPF.[15]

118.   <u>Insurance Policies</u>.  In the ordinary course of business, the Debtors maintain certain Insurance Policies covering, *inter alia*, general liability, automobile liability, workers compensation, physical damage to oil and gas property and equipment, drilling and well control, director and officer, employment practices, and fiduciary liability.  The Insurance Policies are essential to the Debtors' ongoing operations.  A summary of the Insurance Policies is attached to the Insurance Motion as **<u>Exhibit A</u>**.

119.   The success of the Debtors' efforts to operate in chapter 11 will depend on the maintenance of the Insurance Policies on an uninterrupted basis.  The Debtors' failure to pay the Insurance Claims, as and when they become due, could affect their ability to renew the Insurance Policies, which could have a material adverse effect on the Debtors' operations.  If the Insurance Policies are allowed to lapse or are terminated, or if the Debtors default under the Insurance Policies based on their non-payment of Insurance Claims, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others.  This exposure would negatively impact the Debtors' ability to operate effectively and efficiently

---

[14] The approximate annual compensation for Lockton is $65,039 and for Wortham is $20,000.

[15] The Debtors owed USPF $42,787.28 as the final financing payment under the Premium Financing Agreement and such payment is due on May 1, 2016.

**DECLARATION OF ROBERT C. TURNHAM, JR.**
**<u>IN SUPPORT OF FIRST DAY PLEADINGS</u>**                                    **Page 39 of 49**

without disruption in chapter 11.  Additionally, to ensure the retention of qualified and dedicated senior management, the Debtors must continue the directors' and officers' liability policies. Accordingly, I believe that the Debtors should be authorized to maintain the Insurance Policies and pay the Insurance Claims as well as to revise, extend, supplement, or change insurance coverage, as necessary, in the ordinary course of business.

120.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Insurance Motion.

> **vi.**    ***Emergency Motion for Authority to Pay Royalty and Working Interest Obligations* (the "<u>Royalty Motion</u>")**

121.    <u>Oil and Gas Leases and Operations</u>.  The Debtors' operations are focused on the exploration, development, and production of oil and gas.  The Debtors own an interest in approximately 8,000 oil, gas, and mineral leases, and are parties to numerous JOAs governing operations of the wells.  All of the Debtors' leasehold interests are subject to or burdened by one or more of: royalty interests, overriding royalty interests, non-participating royalty interests, and third party working and non-working interests.

122.    The Debtors, as operators, among other things: (a) often market and sell hydrocarbons produced from the operated wells on behalf of the holders of (i) non-operating working interest owners and (ii) Mineral and Other Interests; (b) distribute the proceeds from the sale of such production to such holders; and (c) pay the Offer to Lease ("<u>OTL</u>") amounts and Delay Rentals and other costs associated with the operation of the oil and gas wells.

123.    <u>The Mineral and Other Interests</u>.  In connection with their oil and gas assets, the Debtors are obligated, pursuant to their oil and gas leases and other agreements, to remit to the lessors of the oil and gas leases and potentially other parties their share of revenue from the

producing wells located on the respective leases (the "Royalties").   In addition, overriding royalties (the "ORRI") must be remitted to the owners of those interests, and the holders of non-executive mineral interests (the "Non-Executive Interests") as well as the holders of non-participating royalty interests (the "NPRI" and, together with the Royalties, ORRI, and Non-Executive Interests, the "Mineral and Other Interests") must receive the proceeds due to them pursuant to the applicable agreement.[16]   Failure to forward the aforementioned required amounts would have a material adverse effect upon the Debtors and their operations, including, without limitation, potential cancellation, forfeiture, or termination of oil and gas leases, penalties and interest, turnover actions, conversion claims, significant lien claims, constructive trust claims, litigation, and, in some instances, removal as operator.[17]   Accordingly, I believe the Debtors should be authorized to (a) pay outstanding and undisputed pre-petition amounts owed on account of Mineral and Other Interests as such have been paid by the Debtors in the ordinary course of business; and (b) continue to pay post-petition amounts attributable to the Mineral and Other Interests in the ordinary course of business.[18]

124.   Delay Rentals.   Often the Debtors are also required to make rental payments during a term of a lease (the "Delay Rentals").   Payment of the Delay Rentals postpones the Debtors' obligation for initial exploration and development of each lease for the entire period for

---

[16] For the avoidance of doubt, the Debtors are also obligated to remit a portion of the revenue from producing wells that remains after deducting the amounts attributable to the foregoing interests to the owners of the working interests in those wells.

[17] In certain circumstances, the Debtors have received payment for the share of proceeds due to the holders of Mineral and Other Interests; however, due to timing, such proceeds have not been remitted to such holders of Mineral and Other Interests prior to the Petition Date.

[18] The proposed payment of outstanding and undisputed pre-petition amounts owed does not include any pre-petition suspense funds, which represent amounts that are due and owing to certain holders of Mineral and Other Interests but are otherwise unpayable for a variety of reasons, including, *inter alia*, incorrect contact information, ongoing disputes over ownership of the underlying interest, and failure to meet minimum payment requirements. To the extent that the issue preventing payment of suspense funds to a particular interest holder is resolved, the Debtors reserve their rights to seek court order to authorize payment of such funds.

which they are paid.  Thus, if the Delay Rentals are paid on or before the anniversary date for each year during the primary term of each lease, each lease will be maintained in full force in effect and the Debtors will not be required to engage in exploration and development.  If the Delay Rentals are not paid and the Debtors do not engage in exploration and development, the lease will terminate.  Accordingly, failure to pay the Delay Rentals could similarly have a material adverse effect upon the Debtors and their operations, including, inter alia, the loss of the underlying lease.  Therefore, I believe the Debtors should be authorized to pay outstanding undisputed pre-petition Delay Rentals and continue to pay such Delay Rentals post-petition in the ordinary course of business.

125.  <u>Offers to Lease</u>.  In addition to the various expenses owed in connection with existing wells, the Debtors incur liabilities through their efforts to secure additional oil and gas leases and extend certain others.  The Debtors often solicit potential and current lessors by sending a letter expressing a desire to enter into (or extend) a lease arrangement and enclosing a proposed lease or lease amendment, as applicable.  To entice the potential and current lessors to execute and return the appropriate documentation, the Debtors may also include an OTL.  An OTL is the mechanism by which cash and additional cash consideration is provided to the lessor if the lease (or lease amendment) and OTL are both signed and returned to the Debtors.  Once both executed documents are received, the Debtors send a check in the amount required under the OTL.  The Debtors' books and records indicate that, as of the Petition Date, the Debtors have approximately $2,190 in outstanding OTL obligations.  Given the minimal outstanding OTL liabilities and the potential benefits from acceptance of such OTLs, I believe the Debtors should

be authorized to pay outstanding and undisputed pre-petition OTL obligations and continue to pay such OTL obligations post-petition in the ordinary course of business.[19]

126.   <u>Marketing Obligations</u>.  The Debtors are also obligated under various agreements to market the oil and gas production (the "<u>Marketed Production</u>") of certain owners of working interests (the "<u>Working Interests</u>") to potential purchasers and remit the amounts due to the appropriate parties (the "<u>Marketing Obligations</u>" and, together with the amounts owed to owners of Mineral and Other Interests, Delay Rentals, and OTL's, the "<u>Obligations</u>").  Specifically, following the sale of Marketed Production and the receipt of proceeds attributable thereto, the Debtors are obligated to remit the amount of those proceeds belonging to the owner of the Working Interest, net of all applicable Mineral and Other Interests, gathering costs, processing and transportation expenses, and production taxes.  The Marketing Obligations also require that the Debtors process and forward to the appropriate parties, from funds otherwise belonging to third parties, the amounts due on account of the Mineral and Other Interests, gathering costs, processing and transportation expenses, and production taxes.

127.   Failure to forward all required amounts could have a material adverse effect upon the Debtors, including, without limitation, penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the estate, litigation, and, in some instances, removal as operator.[20]   Accordingly, I believe the Debtors should be authorized to pay outstanding and undisputed pre-petition Marketing

---

[19] The Debtors anticipate paying approximately $500 in outstanding OTL liabilities during period between the entry of interim and final orders on the Royalty Motion.

[20] In certain circumstances, the Debtors have received payment for the share of proceeds due to the appropriate parties in connection with the Marketing Obligations; however, due to timing, such proceeds have not been remitted to such parties prior to the Petition Date.  The Debtors do not anticipate having to pay any material amounts on account of the Marketing Obligations during the period between the entry of interim and final orders on the Royalty Motion.

Obligations and continue to such Marketing Obligations post-petition in the ordinary course of business.

128.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Royalty Motion.

        **vii.**    ***Motion to Establish Notification Procedures and Approve Restrictions of Certain Transfers of Interest in the Debtors' Estates* (the "<u>Stock Trading Motion</u>")**

129.    The Debtors have incurred and expect to continue to incur significant NOLs. The Debtors estimate that as of December 31, 2015, they have NOLs of approximately $824.6 million and $241 million for federal and state tax reporting purposes, respectively. In addition, as of December 31, 2015, the Debtors have generated $1.0 million in minimum tax credits (the "<u>AMT Credits</u>" remaining and, together with the NOLs, the "<u>Tax Attributes</u>") for federal tax reporting purposes.[21] The Tax Attributes are extremely valuable assets of the Debtors' estates because the Internal Revenue Code of 1986 (as amended, the "<u>IRC</u>") allows a corporation to "carry forward" certain tax attributes to offset taxable income and tax liability, thereby reducing future aggregate tax obligations and enhancing the corporation's liquidity in the future. Specifically, section 172 of the IRC allows corporations to carry forward NOLs to offset future taxable income for up to twenty (20) taxable years, thereby reducing future aggregate tax

---

[21]    I understand the Tax Attributes have been reduced to account for cancellation of indebtedness income, or "CODI." The Debtors generated approximately $192.1 million and $7.1 million in CODI as a result of debt repurchases by the Debtors in 2015 and 2016, respectively, for less than the adjusted issue price of such debt.

obligations.[22]   In addition, section 53 of the IRC allows corporations to carry forward AMT

Credits indefinitely, thereby reducing future aggregate tax obligations.[23]

130.    The Debtors' Tax Attributes may be worth as much as $307.7 million in

potential future tax savings.[24]   Even if Section 108(b) of the IRC significantly reduces or

eliminates the Debtor's Tax Attributes pursuant to a chapter 11 plan of reorganization as a result

of the discharge of the debt, the Tax Attributes are available to offset any income realized

through the taxable year that includes the effective date of the plan.   Accordingly, the value of

the Tax Attributes could provide a significant benefit to the Debtors' estates and will inure to the

benefit of all of the Debtors' stakeholders.

131.    I understand that if the relief requested in the Stock Trading Motion is not

granted, there is a risk that, as a result of pre-consummation trading and acquisitions of Stock in

debtor Goodrich, this special relief would not be available to Goodrich and the use of the

Debtors' Tax Attributes may be permanently impaired.   Simply put, if pre-plan trading in Stock

results in an Ownership Change, the more stringent restrictions on prospective NOL treatment of

section 382 of the IRC will apply.   Accordingly, the Court should implement the Notification

Procedures and restrictions set forth in the Stock Trading Motion to ensure that:   (a) an

Ownership Change does not occur prior to the effective date of the chapter 11 plan in these

cases; and (b) with respect to an Ownership Change occurring under a chapter 11 plan, the

Debtors have the opportunity to utilize the Tax Attributes to offset any income realized through

---

[22]   *See* 26 U.S.C. § 172.  NOLs also may be utilized to offset the Debtors' taxable income generated by transactions consummated during these chapter 11 cases.

[23]   *See* S. Rep. No. 313, 99th Cong., 2d Sess. 521, 536 (1986).

[24]   I understand this projection is based upon (a) tax savings generated by the NOLs based on a U.S. federal corporate income tax rate of 35% and a blended state corporate income tax rate of 7.5% and (b) a dollar-for-dollar reduction in U.S. federal income taxes for the AMT Credit.

the taxable year that includes the effective date of the plan and, if any Tax Attributes remain after the application of Section 108(b) of the IRC, the Debtors will avail themselves of the more lenient standard provided by section 382 of the IRC with respect to chapter 11 plan Ownership Changes.

132.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Stock Trading Motion.

> **viii.   *Emergency Motion for an Order Authorizing the Debtors to Pay Taxes and Related Obligations* (the "<u>Taxes Motion</u>")**

133.     In the ordinary course of business, the Debtors request to pay, subject to any order authorizing the use of the Debtors' cash collateral, pre-petition and post-petition taxes (the "<u>Taxes</u>") to the respective taxing authorities (collectively, the "<u>Taxing Authorities</u>") when such Taxes become due; provided, however, the payment of the pre-petition Taxes by the Debtors shall not exceed in the aggregate $200,000 (the "<u>Cap</u>").  The Debtors determined the Cap by estimating $200,000 owed in pre-petition federal, state, and local severance and production taxes for their operations in Texas, Louisiana, and Mississippi (the "<u>Production Taxes</u>").  The Cap also includes estimates of $30,000 in franchise taxes and $2,000 in other state taxes incurred pre-petition.[25]  Such relief shall be without prejudice to the Debtors' rights to contest the amounts of any Taxes on any grounds they deem appropriate.

---

[25] The Debtors anticipate paying approximately $500,000 in Production Taxes ($200,000 of which may be attributed to pre-petition Production Taxes) to the Taxing Authorities during the period between the entry of the Interim Order and the Final Order.  The Debtors do not anticipate owing any other Taxes during the duration of the bankruptcy case, however, the Debtors reserve the right to pay such Taxes if such Taxes are incurred in the ordinary course of business during the bankruptcy case.

134.    Certain Taxing Authorities assess Production Taxes based on the Debtors' extraction of oil and gas, usually as a percentage of revenues.[26]  Production Taxes are essentially akin to a sales tax in form and effect.   I am aware that each state in which the Debtors operate has different rules, guidelines, and procedures related to the assessment of the Production Taxes, and it is my understanding that each of such states assesses its taxes at a different rate ranging from .075 percent to .125 percent.[27]  Because the payment of Production Taxes is directly related to the Debtors' ability to continue the extraction and sale of oil and gas, payment of the Production Taxes is critical to the Debtors' continued operations.   Accordingly, I believe the Debtors should be authorized to pay, in the normal course of the Debtors' operations, any Production Taxes if and when they become due and payable during the pendency of the Cases.

135.    I am aware that, to the extent the Debtors have collected any Taxes from third parties (the "Trust Fund Taxes"), such amounts may be held in trust for the benefit of the Taxing Authorities.   I am also aware that in many states, officers and directors of the collecting entity may be held personally liable for the payment of Trust Fund Taxes to the Taxing Authorities. Accordingly, as to accrued Taxes of the Debtors that are unpaid as of the Petition Date, the Debtors' officers and directors may be subject to lawsuits during the pendency of the Cases. Such lawsuits would prove distracting for the Debtors and the named officers and directors, whose immediate and full-time attention to the Debtors' operations is required.

136.    I believe that payment of the pre- and post-petition Taxes is critical to the Debtors' continued, uninterrupted operations.   Non-payment of these Taxes may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens,

---

[26] I understand that Louisiana charges a fixed tax per mcf of gas produced.

[27] The Debtors pay the Production Taxes for all wells except oil severance taxes for wells located in Texas, as Texas law requires oil purchasers to pay the oil severance taxes.

preventing the Debtors from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and possibly seeking to impose personal liability on the Debtors' officers and directors for certain unpaid Taxes, all of which could disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.  The failure to pay the Taxes could impair the Debtors' ability to effectively and efficiently operate in chapter 11. Accordingly, I believe that the authority to pay the Taxing Authorities in accordance with the Debtors' pre-petition business practices will enable the Debtors to continue to operate their business in chapter 11 efficiently and without disruption.  Further, I believe the Cap of $500,000 is appropriate, as such amounts are necessary to pay estimated Production Taxes.

137.    For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Taxes Motion.

## III.   CONCLUSION

138.    The Debtors' immediate objective is to continue to operate their businesses with as little interruption or disruption as possible to minimize any loss of value during the pendency of the Cases.  I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect for achieving these objectives will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed:  April 15, 2016.

/s/  Robert C. Turnham, Jr. _____
Robert C. Turnham, Jr.