IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 16-31975 |
| GOODRICH PETROLEUM | § | |
| CORPORATION, | § | (Chapter 11) |
| *et al*. | § | (Joint Administration Requested) |
| | § | |
| DEBTORS.[1] | § | |
| | § | |

### DEBTORS' FIRST OMNIBUS MOTION TO REJECT BURDENSOME CONTRACTS EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

PARTIES RECEIVING THIS OMNIBUS MOTION SHOULD LOCATE THEIR NAMES AND THEIR CONTRACTS OR LEASES LISTED FOR REJECTION.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Goodrich Petroleum Corporation (6193) and Goodrich Petroleum Company, L.L.C. (7273).

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-referenced debtors and debtors in possession (collectively, the "Debtors") file this *First Omnibus Motion to Reject Burdensome Contracts Effective Nunc Pro Tunc to the Petition Date* (the "Motion") and in support respectfully show as follows:

## JURISDICTION AND PROCEDURAL BACKGROUND

1.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

3.      On April 15, 2016 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases").

4.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession under Bankruptcy Code §§ 1107(a) and 1108.

## MATERIAL FACTS

5.      Goodrich Petroleum Corporation, a Delaware corporation ("Goodrich") is an independent oil and natural gas company engaged in the exploration, development, and production of oil and natural gas properties.  Goodrich Petroleum Company, L.L.C. ("Goodrich Subsidiary") is Goodrich's direct wholly owned subsidiary.

6.      The Debtors' producing properties are located primarily in (i) Northwest Louisiana and East Texas, which includes the Haynesville Shale Trend, (ii) Southwest Mississippi and Southeast Louisiana, which includes the Tuscaloosa Marine Shale Trend, and (iii) South Texas, which includes the Eagle Ford Shale Trend.  The Debtors maintain an administrative office in Houston, Texas.  As of December 31, 2015, the Debtors owned interests in 193 producing oil and natural gas wells located in 43 fields in eight states and the Debtors had

estimated proved reserves of approximately 9.1 MMBoe, comprised of 31.9 Bcf of natural gas and 3.8 MMBbls of oil and condensate.

7.     Nearly all of the Debtors' proved oil and natural gas reserves are located in Louisiana, Texas, and Mississippi.   The Debtors presently have an ongoing development portfolio of prospects that it desires to drill.   Future capital spending will be initially directed toward long lateral wells in the Haynesville Shale Trend.   The Debtors also plan to devote a portion of future capital expenditures on drilling and completion activity in the Tuscaloosa Marine Shale Trend.

8.     Additional information concerning the Debtors and their financial condition and results of operations, on a consolidated basis, can be found in Goodrich's annual, quarterly, and current reports filed with the Securities and Exchange Commission ("SEC"), which can be accessed at www.sec.gov and at Goodrich's website, http://www.goodrichpetroleum.com.

**A.     Goodrich Subsidiary's letter agreement with the Burns family parties should be rejected.**

9.     On or about August 28, 2015, Goodrich Subsidiary entered into a letter agreement with various members of the Burns family (the "Burns Agreement"),[2] setting forth the terms under which an audit relating to royalty payments allegedly owed to the Burns family would be conducted.

10.     The Burns Agreement obligates Goodrich Subsidiary to make certain payments, at least one of which has been made.

---

[2] The Burns parties are Carolyn Julia Clark; Michele Clark Cadwallader as Trustee of the Carolyn Julia Clark Family 2011 Trust; Robert E. Wehmeyer, Jr., President of Jefferson Bank as Trustee of the Christopher Stuart Clark Management Trust; Christopher Stuart Clark as Trustee of the Christopher Stuart Clark Family 2011 Trust; Michele Clark Cadwallader; Michele Clark Cadwallader as Trustee of the Michele Clark Cadwallader Family 2011 Trust; Adles Harrand Cadwallader V; Walter Clark Cadwallader; 4819, Ltd., a Texas limited partnership, acting by and through Burns Ranch Enterprises, LLC, general partner; Katherine Burns Terry Horlen as Trustee of the John David Terry, III 1994 Trust; Katherine Burns Terry Horlen as Trustee of the Lisa Christine Terry 1994 Trust.

11.     Goodrich Subsidiary does not expect to receive any future benefit from the Burns Agreement, and further payments on the Burns Agreement would be an unnecessary drain on the Debtors' resources.

12.     The Burns Agreement is subject to rejection under 11 U.S.C. § 365.

13.     Goodrich Subsidiary thus can reject, and both it and its unsecured creditors would benefit from rejecting, the Burns Agreement as of the petition date.

**B.     The Debtors' executory agreements with Champions Pipe and Supply should be rejected.**

14.     Goodrich and/or Goodrich Subsidiary are parties to a sales agreement and/or certain letter agreements with Champions Pipe and Supply, Inc. ("Champions"), under which the Debtors have purchased certain quantities of pipe and agreed in the future to purchase certain additional quantities of pipe.

15.     The Debtors have paid Champions approximately $4 million in accordance with the above-referenced agreements. The payments already made by the Debtors to Champions are the only payments required on account of the pipe that Champions has delivered to the Debtors.

16.     Under the present arrangement, no further payments are due until January 10, 2017. The final invoice is set to be issued on October 10, 2017.

17.     Although the Debtors wish to retain the quantities of pipe that Champions already has delivered and the Debtors already have paid for, the Debtors do not expect to use additional pipe from Champions in their oil and gas business operations.

18.     Accordingly, continuing to purchase and acquire pipe from Champions under the sales and/or letter agreements with Champions would be a burden on the Debtors' estates and an unnecessary drain on the Debtors' resources.

19.     The sales and/or letter agreements with Champions are executory contracts and are subject to rejection under 11 U.S.C. § 365.

20.     The Debtors thus can reject, and both the Debtors and their creditors would benefit from rejecting, the sales and/or letter agreements with Champions as of the petition date.

## C.     Goodrich Subsidiary's Gas Marketing Agreement with Chesapeake Operating should be rejected.

21.     On or about March 10, 2009, Goodrich Subsidiary and Chesapeake Operating, Inc., the predecessor-in-interest of Chesapeake Operating, L.L.C. ("Chesapeake Operating"), entered into a long-term Gas Marketing Agreement (the "GMA").

22.     Under the GMA, Chesapeake Operating agreed to market and sell Goodrich Subsidiary's share of the gas produced ("Product") from certain mineral leases ("Subject Leases") in the Haynesville Shale Trend.

23.     Over time, Goodrich Subsidiary has noticed significant, unfavorable differentials between the benefit it receives for Product marketed by Chesapeake Operating under the GMA and the benefit it receives for Product marketed itself produced from adjacent properties. Goodrich Subsidiary believes that Chesapeake Operating is deducting from the sale proceeds due Goodrich Subsidiary a much higher charge for gathering and related expenses than Goodrich Subsidiary pays to gather the Product that it is marketing itself in the same fields.  These charges under the GMA are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

24.     Goodrich Subsidiary further believes that Chesapeake Operating is charging Goodrich Subsidiary excessively high transportation and related expenses with respect to the Product sold under the GMA.  From 2008 through 2010, Chesapeake Operating entered into a series of long-term transportation agreements with various existing and proposed interstate and intrastate pipelines.   Chesapeake Operating now is passing these costs along to Goodrich

Subsidiary through the GMA. These charges are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

25.     Chesapeake Operating also sells Goodrich Subsidiary's share of the Product at a point further downstream than is reasonable or necessary, which imposes additional, excessive, and unreasonable transportation charges on Goodrich Subsidiary.

26.     Goodrich Subsidiary also believes that the marketing fees charged by Chesapeake Operating are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

27.     Goodrich Subsidiary has filed suit against Chesapeake Energy Corporation, Chesapeake Operating, and Chesapeake Energy Marketing, LLC to, among other things, recover certain damages caused by the wrongful conduct described in such lawsuit and enjoin further breaches of the GMA by Chesapeake Operating.[3] Moreover, as outlined in such lawsuit, Chesapeake Operating has breached the GMA, and Goodrich Subsidiary thus is excused from any further performance under the GMA that otherwise would be required and further is entitled to money damages as pled in the lawsuit.

28.     The GMA includes a 20-year term. For two years after termination, the GMA imposes reimbursement requirements such that if Chesapeake Operating is required to refund to a third party proceeds from the sale of Product under the GMA, Goodrich Subsidiary must pay to Chesapeake Operating its proportionate share of the refund. These provisions are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

29.     The GMA imposes indemnification requirements on Goodrich Subsidiary from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

---

[3] Civ. Action No. 5:14-cv-03228, U.S. District Court, Western District of Louisiana, Shreveport Division.

30. The GMA is an executory contract and is subject to rejection under 11 U.S.C. § 365. It neither constitutes nor contains any covenants running with the land or the Subject Leases. It has not been recorded in any relevant jurisdictions. It is not a subpart of an integrated agreement; instead, it stands alone.

31. Under its June 2008 Joint Operating Agreement ("JOA") with Chesapeake Louisiana, L.P., Goodrich Subsidiary owns a 50% interest in, and has the right to use, the wells (of which there are approximately 40), equipment, and flow lines that have been drilled and installed on the Subject Leases. Under the JOA, Goodrich Subsidiary is further entitled to take its share of the Product in-kind and market such Product itself.

32. Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the GMA, effective on the petition date.

33. On information and belief, Chesapeake Operating has entered into one or more marketing and gathering agreements with other parties to market and sell, among other things, Goodrich Subsidiary's Product pursuant to the GMA. Goodrich Subsidiary is not a party to these agreements and is not bound by them. Alternatively, if such agreements were deemed to affect Goodrich Subsidiary's interests in any respect and/or to bind the Debtors, they would be an unnecessary drain on the Debtors' resources. Goodrich Subsidiary thus moves to reject all such agreements as excessive, unreasonable, and burdensome for the same reasons stated above. To the extent these agreements affect Goodrich Subsidiary's interests and/or bind the Debtors going forward, Goodrich Subsidiary can reject, and both it and its creditors would benefit from rejecting, such agreements as of the petition date.

**D.**    **Goodrich Subsidiary's Subscription Agreement with Drilling Info, Inc. should be rejected.**

34.     On or about November 24, 2015, Goodrich Subsidiary executed a Subscription Agreement with Drilling Info, Inc. ("DI"), under which DI agreed to provide certain services and software to Goodrich Subsidiary.

35.     More specifically, Goodrich Subsidiary agreed to pay fees for access to a product known as the "DI System," including a product known as "DI Plus," for the term of December 1, 2015 through November 30, 2016. The fees are payable in quarterly installments. Goodrich Subsidiary has paid all installments for which it has received an invoice from DI.

36.     Goodrich Subsidiary has no present or future expected need for access to DI Plus, the DI System, or other services available under the Subscription Agreement.

37.     The Subscription Agreement imposes indemnification requirements on Goodrich Subsidiary, from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

38.     Goodrich Subsidiary would not benefit from making future installment payments on the Subscription Agreement. Instead, such payments would be burdensome to the Debtors' estates and an unnecessary drain on the Debtors' resources.

39.     The Subscription Agreement is an executory contract and is subject to rejection under 11 U.S.C. § 365.

40.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the Subscription Agreement as of the petition date.

**E.**    **Goodrich Subsidiary's Commercial Lease from Luz Marie Escamilla should be rejected.**

41.     Goodrich Subsidiary has leased from Ms. Escamilla two office suites containing approximately 1800 square feet of rentable area in Frio County, Texas (the "Escamilla Lease").

42.     The Escamilla Lease commenced on September 1, 2014, and expires on August 31, 2016. The monthly rent under the Escamilla Lease is $3,400. Goodrich Subsidiary has paid all rent presently due under the Escamilla Lease.

43.     The Debtors no longer intend to conduct operations in the area immediately surrounding the office suites covered by the Escamilla Lease.

44.     Going forward, the Debtors will not have a business purpose for renting the office suites covered by the Escamilla Lease.

45.     Paying future rent under the Escamilla Lease would be a burden on the Debtors' estates and an unnecessary drain on the Debtors' resources.

46.     The Escamilla Lease imposes indemnification requirements on Goodrich Subsidiary, from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

47.     The Escamilla Lease is an unexpired lease and is subject to rejection under 11 U.S.C. § 365.

48.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the Escamilla Lease as of the petition date.

**F.      Goodrich Subsidiary's Amended and Restated Gas Gathering and Processing Agreement with Frio LaSalle should be rejected.**

49.     On or about October 1, 2012, Goodrich Subsidiary entered into an Amended and Restated Gas Gathering and Processing Agreement with Frio LaSalle Pipeline, LP (the "GGPA" and "Frio LaSalle," respectively).

50.     Under the GGPA, Frio LaSalle agreed to gather, treat, and process gas that Goodrich Subsidiary produces from certain leased land located in Frio and La Salle counties in Texas.

51.     The GGPA is burdensome and uneconomic for Goodrich Subsidiary. Goodrich Subsidiary has sold its interest in the wells and certain other assets covered by the GGPA to EP Energy E&P Company, L.P ("El Paso Energy").[4]  Goodrich Subsidiary thus does not expect to derive future benefits from the GGPA, because Goodrich Subsidiary is not producing gas for gathering, treatment, or processing by Frio LaSalle.

52.     In addition, the GGPA contains an exclusivity requirement that would make it difficult for Goodrich Subsidiary to deliver gas produced from covered leases or wells to any persons or entities other than Frio LaSalle. This requirement is disadvantageous to and burdensome on Goodrich Subsidiary.

53.     Frio LaSalle charges various fees for its services, including sour gas processing and transport fees, rich gas processing and transport fees, low volume fees, and various fuel fees. It passes along a pro-rata share of all downstream fees charged to Frio LaSalle on account of its services. These and the other fees specified in the GGPA are excessive, unreasonable, and uneconomic for Goodrich Subsidiary.

54.     Under the GGPA, Frio LaSalle constructed new facilities (pipelines and appurtenant facilities) to, among other things, connect the delivery points for Goodrich Subsidiary's gas into Frio LaSalle's gas processing systems. Goodrich Subsidiary agreed to assume certain costs of constructing these new facilities, and has paid all amounts due to-date, except for the last invoice dated January 31, 2016 in the amount of $1,068,543.41. El Paso Energy has assumed Goodrich Subsidiary's obligation to pay the remaining balance relating to the construction of new facilities that will come due over approximately the next five years. Because Goodrich Subsidiary does not expect to use or benefit from the new facilities

---

[4] Goodrich Subsidiary still owns various acreage covered by the GGPA.

constructed by Frio LaSalle, any further payment with respect to such facilities would be a burden on the Debtors' estates with no corresponding benefits.

55.     The GGPA is not set to expire until July 31, 2020. Goodrich Subsidiary derives no benefit from this lengthy term, and even if Goodrich Subsidiary decided to produce from the acreage subject to the GGPA and not sold to El Paso Energy, it would not benefit from an obligation to deliver such production to Frio LaSalle for that length of time. Accordingly, the GGPA's length is excessive, unreasonable, and burdensome to Goodrich Subsidiary.

56.     The GGPA imposes indemnification requirements on Goodrich Subsidiary from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

57.     The GGPA is an executory contract and is subject to rejection under 11 U.S.C. § 365. It neither constitutes nor contains any covenants running with the land or the leases referenced therein. It has not been recorded in any relevant jurisdictions.

58.     Because Goodrich Subsidiary does not find it beneficial to produce gas in accordance with the GGPA, and has no use for the new facilities constructed by Frio LaSalle, the GGPA is burdensome on the Debtors' estates.

59.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the GGPA as of the petition date.

**G.     Goodrich's Data License Agreement with IHS Global should be rejected.**

60.     On or about March 4, 2004, Goodrich executed a Data License Agreement with Petroleum Information/Dwights LLC, n/k/a IHS Global Inc. ("IHS"), under which IHS licensed and agreed to provide certain data and information to Goodrich, as specified on various product attachments, addenda, or exhibits (such agreement together with all such ancillary materials, the "Data License Agreement").

61.     Goodrich has no present or future expected need for access to the data and information supplied by IHS or other services available under the Data License Agreement.

62.     Goodrich would not benefit from making future payments under the Data License Agreement. Instead, such payments would be burdensome to the Debtors' estates and an unnecessary drain on the Debtors' resources.

63.     The Data License Agreement is an executory contract and is subject to rejection under 11 U.S.C. § 365.

64.     Goodrich thus can reject, and both it and its creditors would benefit from rejecting, the Data License Agreement as of the petition date.

**RELIEF REQUESTED**

65.     The Debtors request that the Court enter an order under Bankruptcy Code § 365 authorizing the rejection of the contracts and unexpired leases listed on the attached **Exhibit A** (the "Contracts") effective *nunc pro tunc* to the Petition Date.

66.     Bankruptcy Code § 365 provides that the debtor-in-possession, "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code § 365 does not provide a standard for determining when rejection is appropriate. *In re Monarch Tool & Manufacturing Co.*, 114 B.R. 134 (Bankr. S.D. Ohio 1990). Most courts, however, generally acknowledge that the business judgment standard should be applied to determine whether to authorize the rejection of executory contracts and unexpired leases. *See In re Liljeberg Enters., Inc.*, 304 F.3d 410, 438 (5th Cir. 2002); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36-40 (3d Cir. 1989) (holding that the rejection of an executory contract is appropriate upon the finding that such rejection would be beneficial to the debtor's estate); *In*

*re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 811 (Bankr. S.D. Ohio 1991) (citing, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) and *Group of Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523 (1943)). The burden or hardship on the counter party to a rejected contract or lease is not a factor to be considered. *Borman's, Inc. v. Allied Supermarkets, Inc.*, 706 F.2d 187, 189 (6th Cir.) (dicta), cert. denied, 464 U.S. 908 (1983) (emphasis added).

67.      The Debtors no longer require the benefit of the Contracts, which are a burden on their business and their attempts to reorganize successfully. Accordingly, in the exercise of their business judgment, the Debtors have determined that rejecting the Contracts is in the best interest of their estates and creditors. Because the failure to reject the Contracts could result in the incurrence of unnecessary expenses, the rejection of these contracts is appropriate.

## <u>RESERVATION OF RIGHTS</u>

68.      The Debtors specifically reserve the right to withdraw their request to reject any particular Contract at any time prior to the hearing on this Motion.

69.      The filing of this Motion by the Debtors shall not be deemed an admission by the Debtor estates that the Contracts are valid and enforceable contracts or that the parties to the agreements have any claims arising thereunder, and is without waiver of any prior claims the Debtors may have thereunder.  Rather, this Motion is filed in an abundance of caution and the Debtors reserve all rights with respect to those issues.

## <u>PRAYER</u>

The Debtors respectfully request that this Court enter an order, substantially in the form attached as **<u>Exhibit B</u>**, rejecting the Contracts *nunc pro tunc* to the Petition Date and granting the Debtors such other and further relief to which they are entitled.

**VINSON & ELKINS LLP**

/s/ *Bradley R. Foxman*_____
Harry A. Perrin, SBT # 15796800
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002-6760
Ph. (713) 758-2222
Fax  (713) 758-2346
hperrin@velaw.com

Bradley R. Foxman, SBT # 24065243
Garrick C. Smith, SBT # 24088435
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas  75201-2975
Ph.  (214) 220-7700
Fax  (214) 220-7716
bfoxman@velaw.com
gsmith@velaw.com

David S. Meyer, NY # 4576344
Lauren R. Kanzer, NY # 5216635
666 Fifth Avenue, 26th Floor
New York, NY 10103-0040
Ph.  (212) 237-0000
Fax (212) 237-0100
dmeyer@velaw.com
lkanzer@velaw.com

**PROPOSED ATTORNEYS FOR THE
DEBTORS**

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2016, I served a true and accurate copy of the foregoing document on all counsel of record by filing the same with the Court's CM/ECF system.


/s/ *Bradley R. Foxman*

**<u>EXHIBIT A</u>**

## Exhibit A

1.  Letter agreement dated August 28, 2015 between Goodrich Petroleum Company, L.L.C. and Carolyn Julia Clark; Michele Clark Cadwallader as Trustee of the Carolyn Julia Clark Family 2011 Trust; Robert E. Wehmeyer, Jr., President of Jefferson Bank as Trustee of the Christopher Stuart Clark Management Trust; Christopher Stuart Clark as Trustee of the Christopher Stuart Clark Family 2011 Trust; Michele Clark Cadwallader; Michele Clark Cadwallader as Trustee of the Michele Clark Cadwallader Family 2011 Trust; Adles Harrand Cadwallader V; Walter Clark Cadwallader; 4819, Ltd., a Texas limited partnership, acting by and through Burns Ranch Enterprises, LLC, general partner; Katherine Burns Terry Horlen as Trustee of the John David Terry, III 1994 Trust; Katherine Burns Terry Horlen as Trustee of the Lisa Christine Terry 1994 Trust.

2.  Sales and letter agreements between the Debtors and Champions Pipe and Supply, Inc.

3.  Gas Marketing Agreement dated March 10, 2009, between Goodrich Petroleum Company, L.L.C. and Chesapeake Operating, L.L.C.

4.  Subscription Agreement dated November 24, 2015, between Goodrich Petroleum Company, L.L.C. and Drilling Info, Inc.

5.  Commercial Lease commencing September 1, 2014, between Goodrich Petroleum Company, L.L.C. and Luz Marie Escamilla.

6.  Data License Agreement dated March 4, 2004, between Goodrich Petroleum Corporation and IHS Global Inc.

7.  Amended and Restated Gas Gathering and Processing Agreement dated October 1, 2012, between Goodrich Petroleum Company, L.L.C. and Frio LaSalle Pipeline, LP.

**<u>Proposed Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 16-31975** |
| **GOODRICH PETROLEUM** | § | |
| **CORPORATION,** | § | **(Chapter 11)** |
| *et al.* | § | **(Joint Administration Requested)** |
| | § | |
| **DEBTORS.** | § | |
| | § | |

**ORDER GRANTING DEBTORS' FIRST OMNIBUS MOTION**
**TO REJECT BURDENSOME CONTRACTS**
<u>**EFFECTIVE NUNC PRO TUNC TO THE PETITION DATE**</u>

On April ___, 2016, this Court considered the *First Omnibus Motion to Reject Burdensome Contracts Effective Nunc Pro Tunc to the Petition Date* [Docket No. ___] (the "<u>Motion</u>")[1] filed by the above-referenced debtors and debtors in possession (collectively, the "<u>Debtors</u>").[2] The Court finds that (a) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334(b), (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and equity security holders, (d) proper and adequate notice of the Motion and hearing thereon has been given and no other or further notice is necessary, (e) the rejection of the Contracts as set forth herein is an exercise of the Debtors' sound business judgment, and (f) good and sufficient cause exists for granting the relief requested herein, after due deliberation upon the Motion, all objections filed with respect thereto, and all relevant proceedings before the Court in connection with the Motion.

---

[1] Capitalized terms not defined herein have the meaning set forth in the Motion.

[2] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, include: Goodrich Petroleum Corporation (6193) and Goodrich Petroleum Company, L.L.C. (7273).

The Court additionally finds that:

**Burns Family**

1.      On or about August 28, 2015, Goodrich Subsidiary entered into a letter agreement with various members of the Burns family (the "Burns Agreement"),[3] setting forth the terms under which an audit relating to royalty payments allegedly owed to the Burns family would be conducted.

2.      Goodrich Subsidiary does not expect to receive any future benefit from the Burns Agreement, and further payments on the Burns Agreement would be an unnecessary drain on the Debtors' resources.

3.      The Burns Agreement is an executory contract and is subject to rejection under 11 U.S.C. § 365.

4.      Goodrich Subsidiary thus can reject, and both it and its unsecured creditors would benefit from rejecting, the Burns Agreement as of the petition date.

**Champions**

5.      Goodrich and/or Goodrich Subsidiary are parties to a sales agreement and/or certain letter agreements with Champions Pipe and Supply, Inc. ("Champions"), under which the Debtors have purchased certain quantities of pipe and agreed in the future to purchase certain additional quantities of pipe.

---

[3] The Burns parties are Carolyn Julia Clark; Michele Clark Cadwallader as Trustee of the Carolyn Julia Clark Family 2011 Trust; Robert E. Wehmeyer, Jr., President of Jefferson Bank as Trustee of the Christopher Stuart Clark Management Trust; Christopher Stuart Clark as Trustee of the Christopher Stuart Clark Family 2011 Trust; Michele Clark Cadwallader; Michele Clark Cadwallader as Trustee of the Michele Clark Cadwallader Family 2011 Trust; Adles Harrand Cadwallader V; Walter Clark Cadwallader; 4819, Ltd., a Texas limited partnership, acting by and through Burns Ranch Enterprises, LLC, general partner; Katherine Burns Terry Horlen as Trustee of the John David Terry, III 1994 Trust; Katherine Burns Terry Horlen as Trustee of the Lisa Christine Terry 1994 Trust.

6.      The Debtors have paid Champions approximately $4 million in accordance with the above-referenced agreements. The payments already made by the Debtors to Champions are the only payments required on account of the pipe that Champions has delivered to the Debtors.

7.      Under the present arrangement, no further payments are due until January 10, 2017. The final invoice is set to be issued on October 10, 2017.

8.      Continuing to purchase and acquire pipe from Champions under the sales and/or letter agreements with Champions would be a burden on the Debtors' estates and an unnecessary drain on the Debtors' resources.

9.      The sales and/or letter agreements with Champions are executory contracts and are subject to rejection under 11 U.S.C. § 365.

10.      The Debtors thus can reject, and both the Debtors and their creditors would benefit from rejecting, the sales and/or letter agreements with Champions as of the petition date.

**Chesapeake**

11.      On or about March 10, 2009, Goodrich Subsidiary and Chesapeake Operating, Inc., the predecessor-in-interest of Chesapeake Operating, L.L.C. ("Chesapeake Operating"), entered into a long-term Gas Marketing Agreement (the "GMA").

12.      Chesapeake Operating is deducting from the sale proceeds due Goodrich Subsidiary a much higher charge for gathering and related expenses than Goodrich Subsidiary pays to gather the produced gas ("Product") that it is marketing itself in the same fields. These charges under the GMA are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

13.      Chesapeake Operating also is charging Goodrich Subsidiary excessively high transportation and related expenses with respect to the Product sold under the GMA. From 2008 through 2010, Chesapeake Operating entered into a series of long-term transportation agreements

with various existing and proposed interstate and intrastate pipelines. Chesapeake Operating now is passing these costs along to Goodrich Subsidiary through the GMA. These charges are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

14.     Chesapeake Operating sells Goodrich Subsidiary's share of the Product at a point further downstream than is reasonable or necessary, which imposes additional, excessive, and unreasonable transportation charges on Goodrich Subsidiary.

15.     The marketing fees charged by Chesapeake Operating are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

16.     The GMA includes a 20-year term. For two years after termination, the GMA imposes reimbursement requirements such that if Chesapeake Operating is required to refund to a third party proceeds from the sale of Product under the GMA, Goodrich Subsidiary must pay to Chesapeake Operating its proportionate share of the refund. These provisions are excessive, unreasonable, and burdensome to Goodrich Subsidiary.

17.     The GMA imposes indemnification requirements on Goodrich Subsidiary from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

18.     The GMA is an executory contract and is subject to rejection under 11 U.S.C. § 365. It neither constitutes nor contains any covenants running with the land or the Subject Leases. It has not been recorded in any relevant jurisdictions. It is not a subpart of an integrated agreement; instead, it stands alone.

19.     Under its June 2008 Joint Operating Agreement ("JOA") with Chesapeake Louisiana, L.P., Goodrich Subsidiary owns a 50% interest in, and has the right to use, the wells (of which there are approximately 40), equipment, and flow lines that have been drilled and

installed on the Subject Leases.   Under the JOA, Goodrich Subsidiary is further entitled to take its share of the Product in-kind and market such Product itself.

20.      Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the GMA, effective on the petition date.

21.      Chesapeake Operating has entered into one or more marketing and gathering agreements with other parties to market and sell, among other things, Goodrich Subsidiary's Product pursuant to the GMA.  Chesapeake Operating's marketing and gathering agreements with other parties have no legal impact as to the Debtors or their interests in property.

**Drilling Info**

22.      On or about November 24, 2015, Goodrich Subsidiary executed a Subscription Agreement with Drilling Info, Inc. ("DI"), under which DI agreed to provide certain services and software to Goodrich Subsidiary.

23.      Goodrich Subsidiary has no present or future expected need for access to DI Plus, the DI System, or other services available under the Subscription Agreement.

24.      The Subscription Agreement imposes indemnification requirements on Goodrich Subsidiary, from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

25.      Goodrich Subsidiary would not benefit from making future installment payments on the Subscription Agreement. Instead, such payments would be burdensome to the Debtors' estates and an unnecessary drain on the Debtors' resources.

26.      The Subscription Agreement is an executory contract and is subject to rejection under 11 U.S.C. § 365.

27.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the Subscription Agreement as of the petition date.

**Escamilla Lease**

28.     Goodrich Subsidiary has leased from Luz Marie Escamilla two office suites containing approximately 1800 square feet of rentable area in Frio County, Texas (the "Escamilla Lease").

29.     Goodrich Subsidiary has paid all rent presently due under the Escamilla Lease.

30.     The Debtors no longer intend to conduct operations in the area immediately surrounding the office suites covered by the Escamilla Lease.

31.     Going forward, the Debtors do not have a business purpose for renting the office suites covered by the Escamilla Lease.

32.     Paying future rent under the Escamilla Lease would be a burden on the Debtors' estates and an unnecessary drain on the Debtors' resources.

33.     The Escamilla Lease imposes indemnification requirements on Goodrich Subsidiary, from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

34.     The Escamilla Lease is an unexpired lease and is subject to rejection under 11 U.S.C. § 365.

35.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the Escamilla Lease as of the petition date.

**Frio LaSalle**

36.     On or about October 1, 2012, Goodrich Subsidiary entered into an Amended and Restated Gas Gathering and Processing Agreement with Frio LaSalle Pipeline, LP (the "GGPA" and "Frio LaSalle," respectively).

37.     The GGPA is burdensome and uneconomic for Goodrich Subsidiary. Goodrich Subsidiary has sold its interest in the wells and certain other assets covered by the GGPA to EP Energy E&P Company, L.P ("El Paso Energy").[4]  Goodrich Subsidiary thus does not expect to derive future benefits from the GGPA, because Goodrich Subsidiary is not producing gas for gathering, treatment, or processing by Frio LaSalle.

38.     In addition, the GGPA contains an exclusivity requirement that would make it difficult for Goodrich Subsidiary to deliver gas produced from covered leases or wells to any persons or entities other than Frio LaSalle. This requirement is disadvantageous to and burdensome on Goodrich Subsidiary.

39.     Frio LaSalle charges various fees for its services, including sour gas processing and transport fees, rich gas processing and transport fees, low volume fees, and various fuel fees. It also passes along a pro-rata share of all downstream fees charged to Frio LaSalle on account of its services. These and the other fees specified in the GGPA are excessive, unreasonable, and uneconomic for Goodrich Subsidiary.

40.     Under the GGPA, Frio LaSalle constructed new facilities (pipelines and appurtenant facilities) to, among other things, connect the delivery points for Goodrich Subsidiary's gas into Frio LaSalle's gas processing systems. Goodrich Subsidiary agreed to assume certain costs of constructing these new facilities, and has paid all amounts due to-date,

---

[4] Goodrich Subsidiary still owns various acreage covered by the GGPA.

except for the last invoice dated January 31, 2016 in the amount of $1,068,543.41. El Paso Energy has assumed Goodrich Subsidiary's obligation to pay the remaining balance relating to the construction of new facilities that will come due over approximately the next five years. Because Goodrich Subsidiary does not expect to use or benefit from the new facilities constructed by Frio LaSalle, any further payment with respect to such facilities would be a burden on the Debtors' estates with no corresponding benefits.

41.     The GGPA is not set to expire until July 31, 2020. Goodrich Subsidiary derives no benefit from this lengthy term, and even if Goodrich Subsidiary decided to produce from the acreage subject to the GGPA and not sold to El Paso Energy, it would not benefit from an obligation to deliver such production to Frio LaSalle for that length of time. Accordingly, the GGPA's length is excessive, unreasonable, and burdensome to Goodrich Subsidiary.

42.     The GGPA imposes indemnification requirements on Goodrich Subsidiary from which Goodrich Subsidiary derives no benefit. These requirements are burdensome to Goodrich Subsidiary.

43.     The GGPA is an executory contract and is subject to rejection under 11 U.S.C. § 365.  It neither constitutes nor contains any covenants running with the land or the leases referenced therein. It has not been recorded in any relevant jurisdictions.

44.     Because Goodrich Subsidiary does not find it beneficial to produce gas in accordance with the GGPA, and has no use for the new facilities constructed by Frio LaSalle, the GGPA is burdensome on the Debtors' estates.

45.     Goodrich Subsidiary thus can reject, and both it and its creditors would benefit from rejecting, the GGPA as of the petition date.

**IHS Global**

46.     On or about March 4, 2004, Goodrich executed a Data License Agreement with Petroleum Information/Dwights LLC, n/k/a IHS Global Inc. ("IHS"), under which IHS licensed and agreed to provide certain data and information to Goodrich, as specified on various product attachments, addenda, or exhibits (such agreement together with all such ancillary materials, the "Data License Agreement").

47.     Goodrich has no present or future expected need for access to the data and information supplied by IHS or other services available under the Data License Agreement.

48.     Goodrich would not benefit from making future payments under the Data License Agreement. Instead, such payments would be burdensome to the Debtors' estates and an unnecessary drain on the Debtors' resources.

49.     The Data License Agreement is an executory contract and is subject to rejection under 11 U.S.C. § 365.

50.     Goodrich thus can reject, and both it and its creditors would benefit from rejecting, the Data License Agreement as of the petition date.

Therefore, it is

**ORDERED** that the Motion is **GRANTED** to the extent provided herein.  It is further

**ORDERED** that the Contracts listed on **Exhibit A** hereto are rejected effective *nunc pro tunc* to the Petition Date.  It is further

**ORDERED** that the Debtors retain all rights, claims, and defenses with respect to the allowance of any claim for damages arising out of the Contracts, whether asserted by or against the Debtors. It is further

**ORDERED** that this Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

### # # # END OF ORDER # # #

SIGNED THIS _____ day of _____, 2016.

_____
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

1.    Letter agreement dated August 28, 2015 between Goodrich Petroleum Company, L.L.C. and Carolyn Julia Clark; Michele Clark Cadwallader as Trustee of the Carolyn Julia Clark Family 2011 Trust; Robert E. Wehmeyer, Jr., President of Jefferson Bank as Trustee of the Christopher Stuart Clark Management Trust; Christopher Stuart Clark as Trustee of the Christopher Stuart Clark Family 2011 Trust; Michele Clark Cadwallader; Michele Clark Cadwallader as Trustee of the Michele Clark Cadwallader Family 2011 Trust; Adles Harrand Cadwallader V; Walter Clark Cadwallader; 4819, Ltd., a Texas limited partnership, acting by and through Burns Ranch Enterprises, LLC, general partner; Katherine Burns Terry Horlen as Trustee of the John David Terry, III 1994 Trust; Katherine Burns Terry Horlen as Trustee of the Lisa Christine Terry 1994 Trust.

2.    Sales and letter agreements between the Debtors and Champions Pipe and Supply, Inc.

3.    Gas Marketing Agreement dated March 10, 2009, between Goodrich Petroleum Company, L.L.C. and Chesapeake Operating, L.L.C.

4.    Subscription Agreement dated November 24, 2015, between Goodrich Petroleum Company, L.L.C. and Drilling Info, Inc.

5.    Commercial Lease commencing September 1, 2014, between Goodrich Petroleum Company, L.L.C. and Luz Marie Escamilla.

6.    Data License Agreement dated March 4, 2004, between Goodrich Petroleum Corporation and IHS Global Inc.

7.    Amended and Restated Gas Gathering and Processing Agreement dated October 1, 2012, between Goodrich Petroleum Company, L.L.C. and Frio LaSalle Pipeline, LP.